UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

SIERRA CLUB and
ANSTED HISTORIC PRESERVATION
COUNCIL, INC.,

       Plaintiffs

v.                                          Civil Action No. 2:08-1363

POWELLTON COAL
COMPANY, LLC,

       Defendant.


<u>MEMORANDUM OPINION AND ORDER</u>


       This action arises under the Federal Water Pollution
Control Act, 33 U.S.C. §§ 1251 through 1387, commonly referred to
as the Clean Water Act ("CWA"), and the Surface Mining Control
and Reclamation Act of 1977 ("SMCRA"), 30 U.S.C. §§ 1201 through
1328.  According to the plaintiffs, between March 1, 2006 and
March 31, 2009 defendant Powellton Coal Company, LLC
("Powellton") accrued at least 6,767 violation of the CWA and
SMCRA as a result of its unlawful discharges of pollutants into
the waters of the United States.  Pending is Powellton's partial
motion to dismiss, filed on May 29, 2009.  For the reasons that
follow, the motion is denied.

I.


        Plaintiffs' claims are brought pursuant to the
provisions for "citizen suits" found in section 505(a) of the
CWA, 33 U.S.C. § 1365(a), and section 520(a) of SMCRA, 30 U.S.C.
§ 1270(a).  What follows is an overview of the statutory and
regulatory regimes in place under the CWA and SMCRA.


A. Clean Water Act


        The CWA was enacted "to restore and maintain the
chemical, physical, and biological integrity of the Nation's
waters." 33 U.S.C. § 1251(a).  To this end, section 301(a) makes
the discharge of "pollutants"[1] from a "point source"[2] into the
waters of the United States unlawful unless the discharger
complies with certain enumerated sections of the CWA.  33 U.S.C.
§ 1311(a).  One such enumerated section is section 402, 33 U.S.C.
§ 1342, which embodies the National Pollution Discharge
Elimination System ("NPDES") permit program, "[t]he cornerstone
of the Clean Water Act's pollution control scheme . . . ."

_____

        [1] See 33 U.S.C. § 1362(6).

        [2] See 33 U.S.C. § 1362(14).

2

Natural Res. Def. Council, Inc. v. U.S. Envtl. Prot. Agency, 822
F.2d 104, 108 (D.C. Cir. 1987).

The issuance of a NPDES permit does not authorize the
recipient to pollute at will.  All NPDES permits authorizing the
discharge of pollutants are conditioned upon such discharges
satisfying the applicable requirements of the CWA.  33 U.S.C. §
1342(a)(1) and (b)(1).  Section 301(b)(1) of the CWA requires
that "every permit contain (1) effluent limitations that reflect
the pollution reduction achievable by using technologically
practicable controls and (2) any more stringent pollutant release
limitations necessary for the waterway receiving the pollutant to
meet 'water quality standards.'"  Piney Run Pres. Ass'n v. County
Comm'rs, 268 F.3d 255, 265 (4th Cir. 2001) (quoting Am. Paper
Inst., Inc. v. U. S. Envt'l. Prot. Agency, 996 F.2d 346, 349
(D.C. Cir. 1993) (citing 33 U.S.C. § 1311(b)(1)(A) and (C)).[3]
NPDES permits also require the holder to establish and maintain

---

[3] Section 502(11) of the CWA defines "effluent limitation"
as "any restriction established by a State or the Administrator
[of the EPA] on quantities, rates, and concentrations of
chemical, physical, biological, and other constituents which are
discharged from point sources into navigable waters . . . ."  33
U.S.C. § 1362(11).  Section 303(a)(3)(a), 33 U.S.C. §
1313(a)(3)(A), requires states to adopt water quality standards.
"A water quality standard (WQS) defines the water quality goals
of a water body, or portion thereof, by designating the use or
uses to be made of the water and by setting criteria necessary to
protect the uses." 40 C.F.R. § 130.3.

records; install, use, and maintain monitoring equipment; sample point source effluent; and submit "discharge monitoring reports" ("DMRs") at regular intervals specified in the permit.  33 U.S.C. § 1318(a)(4)(A); 40 C.F.R. § 122.41(l)(4).  "Noncompliance with a permit constitutes a violation of the [Clean Water] Act." Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 175 (2000) (citing 33 U.S.C. § 1342(h)).

While the Environmental Protection Agency ("EPA") is charged with administering the NPDES program, it is empowered to delegate this authority to individual states.  33 U.S.C. § 1342(b).  Once the EPA approves a state's proposed NPDES program, the EPA suspends its issuance of NPDES permits as to discharges subject to the state program.  33 U.S.C. § 1342(c)(1).  On May 10, 1982, the EPA approved West Virginia's NPDES program, 47 Fed. Reg. 22,363 (May 24, 1982), which is administered by the West Virginia Department of Environmental Protection ("WVDEP").  See Water Pollution Control Act, W. Va. Code §§ 22-11-1 through 29. Permits issued under the West Virginia NPDES program are known as West Virginia National Pollution Discharge Elimination System ("WV/NPDES") permits.

The EPA, states and private citizens all play a role in

4

enforcing the CWA.  Section 505(a)(1) authorizes "citizens"[4] to commence a civil action "against any person . . . who is alleged to be in violation of  . . . an effluent standard or limitation under this chapter . . . ."  33 U.S.C. 1365(a)(1).  Though drafted with less than clarity, section 505(f) provides, "[f]or purposes of this section, the term 'effluent standard or limitation under this chapter' means (1) effective July 1, 1973, an unlawful act under subsection (a) of section 1311 of this title [section 301(a)]; . . . [or] (6) a permit or condition thereof issued under section 1342 of this title [section 402] . . . ."  33 U.S.C. § 1365(f).  Section 505(a) authorizes, "federal courts . . . to enter injunctions and assess civil penalties, payable to the United States Treasury, against any person found to be in violation of 'an effluent standard or limitation' under the Act."  <u>Envtl. Conservation Org. v. City of Dallas</u>, 529 F.3d 519, 526 (2008) (citing 33 U.S.C. § 1365(a)).

While violation of the terms of a NPDES or WV/NPDES permit exposes the permit holder to the possibility of a citizen suit, the right to bring a citizen suit is not without limits.  Pursuant to section 505(b), a citizen suit under 505(a)(1) can

---

[4] Section 505(g) defines "citizen" as "a person or persons having an interest which is may be adversely affected."  33 U.S.C. § 1365(g).

not be commenced until sixty days after the plaintiff gives
notice of the alleged violation to the administrator of the EPA,
the state where the alleged violation is occurring and to the
alleged violator.  33 U.S.C. § 1365(b)(1)(A).  Section 505(b)
provides further that "[n]o action [under section 505(a)(a)] may
be commenced . . . if the Administrator or State has commenced
and is diligently prosecuting a civil or criminal action in a
court of the United States, or a State to require compliance with
the standard, limitation, or order . . . ."  33 U.S.C. § 1365(b).
Similarly, section 309(g), which authorizes the EPA to assess
administrative penalties for violations of, among other things,
the terms of a NPDES permit, precludes citizen suits for
violations with respect to which the EPA or a state "has
commenced and is diligently prosecuting" an administrative
penalty action under section 309(g) or state law "comparable"
thereto.  33 U.S.C. § 1319(g)(6)(A).[5]  As will be seen, the
applicability of section 309(g)(6) to the facts of this action is
in sharp dispute.

_____

[5] Citizen suits are also precluded as to any violation "for
which the Administrator, the Secretary [of the Army], or the
State has issued a final order not subject to further judicial
review and the violator has paid a penalty assessed under this
subsection, or such comparable State law, as the case may be . .
. ."  33 U.S.C. § 1319(g)(6)(iii).

6

**B. Surface Mining Control and Reclamation Act**

SMCRA is a comprehensive statute "enacted to strike a balance between the nation's interests in protecting the environment from the adverse effects of surface coal mining and in assuring the coal supply essential to the nation's energy requirements." Bragg v. W. Va. Coal Ass'n., 248 F.3d 275, 288 (4th Cir. 2001) (citing 30 U.S.C. § 1202(a),(d),(f)); see also Hodel v. Va. Surface Mining & Reclamation Ass'n, 452 U.S. 264, 269 (1981).  These ends are accomplished through a system of "'cooperative federalism,' in which responsibility for the regulation of surface coal mining in the United States is shared between the U.S. Secretary of the Interior and State regulatory authorities." Bragg, 248 F.3d at 288 (citing H.R. Rep. No. 95-218, at 57 (1977), reprinted in 1977 U.S.C.C.A.N. 593, 595). Under section 503 of SMCRA, once a state's proposed program for the regulation of surface coal mining is approved by the Secretary of the Interior as satisfying SMCRA's minimum requirements, the state assumes "exclusive jurisdiction over the regulation of surface coal mining and reclamation operations" on non-federal lands within the state.  30 U.S.C. § 1253.  West Virginia received such federal approval in 1981, 30 C.F.R. § 948.10, and its surface mining program is administered by the

7

WVDEP.  <u>See</u> West Virginia Surface Coal Mining Reclamation Act ("WVSCMRA"), W. Va. Code § 22-3-1 through 32a.

Section 506(a), the heart of SMCRA, prohibits surface coal mining by any person "unless such person has first obtained a permit issued by such State pursuant to an approved State program or by the Secretary pursuant to a Federal program . . . ."  30 U.S.C. § 1256(a).  Pursuant to section 515(a), permits issued under either an approved state program or the federal program, "shall require that such surface coal mining operations will meet all applicable performance standards of this chapter, and such other requirements as the regulatory authority shall promulgate."  30 U.S.C. § 1265(a).[6]  Similarly, the WVSCMRA provides that "[a]ny permit issued by the director pursuant to this article to conduct surface mining operations shall require that the surface mining operations meet all applicable performance standards of this article and other requirements set forth in legislative rules proposed by the director."  W. Va. Code § 22-3-13(a).  In turn, W. Va. Code R. § 38-2-3.33c provides that "[t]he permittee shall comply with the terms and conditions of

---

[6] SMCRA defines "regulatory authority" as "the State regulatory authority where the State is administering this chapter under an approved State program or the Secretary [of the Interior] where the Secretary is administering this chapter under a Federal program."  30 U.S.C. § 1291(22).

the permit, all applicable performance standards of the Act, and this rule."

Like the CWA, SMCRA contains a "citizen suits" provision.  Section 520(a) provides that "any person having an interest which is or may be adversely affected may commence a civil action on his own behalf to compel compliance with this chapter . . . against any . . . person who is alleged to be in violation of any rule, regulation, order or permit issued pursuant to this subchapter . . . ."  30 U.S.C. § 1270(a). Unlike the CWA, however, section 520(a) of SMCRA does not authorize the imposition of civil penalties; citizens are only allowed to file suit in order to compel compliance with SMCRA.[7] While, as a general rule, section 520(a) affords a cause of action to compel compliance with performance standards incorporated into SMCRA permits issued by authorized states such

_____

[7] SMCRA requires plaintiffs to give notice of alleged violations to the Secretary of the Interior, the state and the alleged violator sixty days prior to filing suit.  30 U.S.C. § 1270(b)(1)(A).  "[I]f the Secretary [of the Interior] or the State has commenced and is diligently prosecuting a civil action in a court of the United States or a State to require compliance with the provisions of this chapter, or any rule, regulation, order, or permit issued pursuant to this chapter," a citizen suit cannot be commenced.  30 U.S.C. § 1270(b)(1)(B).

as West Virginia,[8] section 702(a) of SMCRA provides that
"[n]othing in this chapter shall be construed as superceding,
amending, modifying, or repealing" the CWA or state laws enacted
pursuant to it.  30 U.S.C. § 1292(a)(3).  As more fully developed
below, at issue is whether plaintiffs' claims under section
520(a) run afoul of section 702(a) by impinging on the province
of the CWA.


                               II.


          Powellton is a West Virginia limited liability company
doing business in Bickmore, West Virginia.  (First Am. Compl. ¶
13).  Plaintiffs, the Sierra Club and the Anstead Historic
Preservation Council, Inc., are nonprofit organizations committed
to the protection of the environment in West Virginia and
elsewhere.  (Id. ¶ 12-13).  The first amended complaint states
that "[p]laintiffs' members suffer injuries to their aesthetic,
recreational, environmental, and/or economic interests as a
result of Defendant's unlawful discharge of pollutants."  (Id. ¶
14).

---

          [8] Surface coal mining permits issued by the WVDEP pursuant
to its authority under SMCRA and the WVSCMRA will be referred to
as "WVSCMRA permits."

                               10

At all times relevant to this action, Powellton has held WV/NPDES permit number WV 1019449 and WVSCMRA permit number S300301 for its Bridge Fork Surface Mine; WV/NPDES permit number 1019279 and WVSCMRA permit number S3000400 for its Bridge Fork Surface Mine No. 1; and WV/NPDES permit number 1019287 and WVSCMRA permit numbers O300500 and O300700 for its Sugarcamp Loadout and Rich Creek Haulroad.  (Id. ¶¶ 37-38, 44-45, 51-52; Answer to First Am. Compl. ¶¶ 37-38, 44-45, 51-52).  According to the first amended complaint, Powellton's three WV/NPDES permits contain effluent limitations which limit the amount of pollutants, including suspended solids, iron, aluminum and manganese, that Powellton is allowed to discharge into the waters of the United States.  (First Am. Comp. ¶ 39-40, 46-47, 53-54). Based on DMRs submitted to the WVDEP by Powellton, plaintiffs contend that between March 1, 2006 and March 31, 2009 Powellton accrued thousands of violations of the effluent limitation imposed by its WV/NPDES permits.  (Id. ¶¶ 5, 42, 49, 55; Violation Summaries, First Am. Compl., Apps. A, B and C.). Because of Powellton's pattern of violating the effluent limitations in its WV/NPDES permits, and lack of any meaningful efforts to eradicate the cause of the violations, plaintiffs allege that Powellton is in "continuing and/or intermittent violation of the Clean Water Act and SMCRA."  (Id. ¶ 43, 50, 56).

11

Seeking to comply with the notice requirements of the CWA and SMCRA, on August 27, 2008 plaintiffs sent a notice of intent letter ("NOI") to the manager of Powellton, Garry Patterson; the Secretary of the WVDEP, Randy Huffman; the Regional Administrator of the EPA for Region III, Donald Walsh; the Administrator of the EPA, Stephen L. Johnson; the Secretary of the U.S. Department of the Interior, Dirk Kempthorne; the Director of the Office of Surface Mining Reclamation and Enforcement, Brent Wahlquist; Powellton's registered agent, CT Corporation System; and the Regional Director for the Appalachian Region of the Office of Surface Mining Enforcement and Reclamation.  (Id. ¶¶ 57, 59; 8/27/08 NOI, Partial Mot. to Dismiss, Ex. 1).  The NOI informed Powellton that "its discharges of suspended solids, iron, manganese, and aluminum and violations of the effluent limitations" in the three WV/NPDES permits at issue "violate the Clean Water Act and SMCRA."  (First Am. Compl. ¶ 57).  Powellton was further informed of plaintiffs' intent to sue for these violations at the end of the sixty-day statutory notice period.  (Id. ¶ 58); see 33 U.S.C. § 1365(b)(1)(A); 30 U.S.C. § 1270(b)(1)(A).

Apparently unbeknownst to the plaintiffs, thirteen months before the NOI was sent to Powellton and the other

recipients, Powellton and other related entities began discussions with the WVDEP "with respect to WV/NPDES permit non-compliance issues." (7/20/07 Bradley Letter, Partial Mot. to Dismiss, Ex. 8). A July 20, 2007 letter sent by attorney M. Ann Bradley to the WVDEP states that Powellton and the other entities "would be willing to cooperate with the Department of Environmental Protection in the resolution of these issues." (Id.) In response, the WVDEP sent Powellton three letters, dated July 24, August 16 and August 29 of 2007, respectively concerning WV/NPDES permit numbers WV1019449, WV1019279 and WV1019287 - the same permits referenced in plaintiffs' NOI and at issue in this action. (7/24/07, 8/16/07, 8/29/07 WVDEP Letters, Partial Mot. to Dismiss, Exs. 9, 10). All three letters sought information regarding discharges under the permits from July 1, 2006 through June 30, 2007, including information on every violation of the effluent limitations contained in the permits, the locations of the permitted outfalls, the quality of the receiving streams, and other information regarding compliance with the permits. (Id.) The opening paragraph of each of the letters states:

> Pursuant to your client's request to resolve outstanding Discharge Monitoring Report violations, the West Virginia Department of Environmental Protection (WVDEP) is currently pursuing an enforcement action involving Powellton Coal Company, LLC regarding its WV/NPDES permit violations. This action is being taken under the provisions of the Water Pollution Control Act

> (WV Code Chapter 22, Article 11).  As part of this
> action, WVDEP requests that your client provide
> information pursuant to WV Code Chapter 22, Article 11,
> Section 4 for permit . . . [numbers WV1019279,
> WV1019449, WV1019287].

(Id.)  By letters dated August 14 and September 14, 2007,

Powellton responded to the WVDEP's requests for information.

(8/14/07 and 9/14/07 Bradley Letters, Partial Mot. to Dismiss,

Ex. 11).

        Expanding the scope of its review, on January 17, 2008

the WVDEP sent another letter to Powellton requesting the same

information it had sought in its earlier letters, but for the

period of July 1, 2007 though December 31, 2007.  (1/17/08 WVDEP

Letter, Partial Mot. to Dismiss, Ex. 12).  The opening paragraph

of the letter states:

> In furtherance of the West Virginia Department of
> Environmental Protection's (WVDEP) ongoing enforcement
> action involving Powellton Coal Company, LLC regarding
> its WV/NPDES permit violations, additional information
> is requested for permit number(s) WV1019279, WV1019287,
> and WV109449.  This information is in addition to that
> previously submitted by Powellton Coal Company, LLC and
> is requested pursuant to WV Code Chapter 232, Article
> 11, Section 4.

(Id.)  Powellton forwarded the requested information to the WVDEP

by letter dated February 27, 2008.  (2/27/08 Bradley Letter,

Partial Mot. to Dismiss, Ex. 13).

        On August 29, 2008, two days after plaintiffs sent the

NOI, the WVDEP issued a draft "Consent Order" number M-08-021 to Powellton.  (Draft Order, Partial Mot. to Dismiss, Ex. 2).  Four days later, on September 2, 2008, Garry Patterson signed the draft order on Powellton's behalf.  (Id.).  On October 17, 2008, at the conclusion of the public notice and comment period mandated by W. VA. CODE R. § 47-1-1 through 7, the WVDEP sent Powellton a letter stating that only one comment had been received, that the comment did not relate to the content of the order, and that no changes had been made to draft order.  (10/17/08 WVDEP Letter, Partial Mot. to Dismiss, Ex. 4).  Enclosed with the letter was a fully executed copy of consent order number M-08-021, which became effective on October 16, 2008.  (Id.; Consent Order, Partial Mot. to Dismiss, Ex. 4).

        The consent order requires Powellton to "immediately take all measures to initiate compliance with all terms and conditions" of WV/NPDES permit numbers WV1019449, WV1019279 and WV1019287.  (Consent Order at 3, Partial Mot. to Dismiss, Ex. 4).  Within ninety days of its entry, the order requires Powellton to submit a "Corrective Action Plan" outlining how and when Powellton will achieve compliance with those permit limits for which compliance cannot immediately be achieved.  (Id.)  The order also requires Powellton to submit a "Reporting Plan"

addressing certain issues "relating to reporting requirements

under the Permits . . . ."  (<u>Id.</u> at 4).  Attached to the order is

a "Summary of Permitted Effluent Limit Violations," which the

order describes as:

> a. 21 (twenty one) minor violations of average monthly
>    permit limits or maximum daily permit limits.
> b. 26 (twenty six) moderate violations of average monthly
>    permit limits or maximum daily permit limits.
> c. 3 (three) major violations of average monthly permit
>    limits or maximum daily permit limits.

(<u>Id.</u> at 2).

"Because of Powellton's WV/NPDES permit violations,"

Powellton agreed, through the consent order, to the assessment of

a $121,110 administrative penalty. (<u>Id.</u> at 5).  The order also

establishes four categories of stipulated penalties: (a) $10,000

for each month Powellton fails to submit a DMR for one or more

outlets with permit limits; (b) $1,000 through $3,000 "per day

per violation" for failure to comply with the terms of the

consent order; (c) $1,000 through $5,0000 per violation of

"permit limits at the outlets and for parameters" addressed in

the Corrective Action Plan; (d) $1,000 through $3,000 for

"exceedences of effluent limitations specified in the Permits"

for the period from January 1, 2008 through the effective date of

the order, October 16, 2008.  (<u>Id.</u> at 5-6).

16

On October 24, 2008, eight days after the consent order became effective, Powellton sent the plaintiffs a letter in response to the NOI.  (10/24/08 Response to NOI, Partial Mot. to Dismiss, Ex. 5).  The letter states that the violations alleged in the NOI "are the subject of a comprehensive enforcement action by the WVDEP," and thus, plaintiffs' claims under the CWA are precluded.  (Id. at 1-3).  The letter provides further that the relief sought by plaintiffs' threatened SMCRA claims "has already been provided by the WVDEP through the issuance of the Consent Order," and that brining suit under SMCRA "would be unfounded and an irresponsible waste of judicial resources."  (Id. at 4).  Nevertheless, on November 24, 2008, eighty-nine days after sending the NOI, plaintiffs instituted this action.

On November 25, 2008, a day after filing suit, plaintiffs sent a second NOI to Powellton and the same individuals and entities to which the first NOI had been sent.  (First Am. Compl. ¶ 61, 63).  This second NOI notified Powellton of alleged CWA and SMCRA violations resulting from unlawful discharges of suspended solids, iron and aluminum under WV/NPDES permit numbers WV1019449 and WV1019279 during the third quarter of 2008 at outfalls not identified in the first NOI.  (Id. ¶ 61).  The second NOI also notified Powellton of plaintiffs' intent to

17

sue for these violations at the end of the sixty-day notice period.  (Id. ¶ 62).  On February 13, 2009, plaintiffs sent Powellton, the EPA, the WVDEP and others a third and final NOI notifying Powellton of plaintiffs' intent to amend the complaint to include claims for violations of parameters included in the first NOI of August 27, 2008 but omitted from the original complaint; violations of parameters included in the second NOI of November 25, 2008; and violations of parameters revealed by Powellton's fourth quarter 2008 DMRs that were not identified in either the first or second NOI.

Ninety-one days after sending the third NOI, on May 15, 2009, plaintiffs filed a six-count first amended complaint for declaratory and injunctive relief and for civil penalties.  The first amended complaint sets forth the following claims: Count I, CWA Violations of WV/NPDES Permit Number WV1019449; Count II, SMCRA Violations Related to WV/NPDES Permit Number WV1019449; Count III, CWA Violations of WV/NPDES Permit Numer WV1019279; Count IV, SMCRA Violations Related to WV/NPDES Permit Number WV1019279; Count V, CWA Violations of WV/NPDES Permit Numer WV1019287; Count VI, SMCRA Violations Related to WV/NPDES Permit Numer WV1019287.  Plaintiffs seek an order declaring that Powellton has violated and continues to violate the CWA and

SMCRA; enjoining Powellton from operating its facilities in a manner that will result in further violations of the effluent limitations in WV/NPDES permit numbers WV0109449, WV1019279 and WV1019287; ordering Powellton to immediately comply with all effluent limitations, monitoring and reporting requirements and other terms and conditions of the three WV/NPDES permits; ordering Powellton to immediately comply with the terms and conditions of WVSCMRA permit numbers S300301, S3000400, O300500 and O300700; ordering Powellton to pay civil penalties up to $27,500 per day for each violation of the CWA occurring prior to March 15, 2004, and $32,500 per day for each violation occurring after that date; ordering Powellton to conduct monitoring and sampling to determine the environmental effects of its violations, to remedy and repair environmental contamination and/or degradation caused by its violations, and restore the environment to its prior uncontaminated condition; awarding plaintiffs' attorney and expert witness fees and all other reasonable expenses incurred in pursuing this action; and granting other such relief as the court deems just and proper. (First Am. Compl at 21-22).

In sections III and IV that follow, the court considers first the CWA claims and then the SMCRA claims.

III.

Powellton argues that because the court lacks subject matter jurisdiction over plaintiffs' CWA claims as to which the WVDEP "has commenced and is diligently prosecuting" an administrative penalty action under state law "comparable" to section 309(g) of the CWA, 33 U.S.C. § 1319(g), all such claims should be dismissed.

1. Federal Rule of Civil Procedure 12(b)(1)

Federal district courts are courts of limited subject matter jurisdiction. "They possess only the jurisdiction authorized them by the United States Constitution and by federal statute." United States v. ex rel. Vuyyuru v. Jadhav, 555 F.3d 337, 347 (4th Cir. 2008). As such, "there is no presumption that the court has jurisdiction." Pinkley, Inc. v. City of Frederick, 191 F.3d 394, 399 (4th Cir. 1999) (citing Lehigh Mining & Mfg. Co. v. Kelly, 160 U.S. 327, 327 (1895)). Indeed, when the existence of subject matter jurisdiction over a claim is challenged under Fed. R. Civ. P. 12(b)(1), "[t]he plaintiff has the burden of proving that subject matter jurisdiction exists." Evans v. B.F. Perkins Co., 166 F.3d 642, 647 (4th Cir. 1999); see

20

also <u>Richmond, Fredericksburg & Potomac R.R. Co. v. United States</u>, 945 F.2d 765, 768 (4th Cir. 1991)).  If subject matter jurisdiction is lacking, the claim must be dismissed.  <u>See</u> <u>Arbaugh v. Y & H Corp.</u>, 546 U.S. 500, 506 (2006).

In considering a challenge to its subject matter jurisdiction, "the district court is to regard the pleadings as mere evidence on the issue, and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment."  <u>Evans</u>, 166 F.3d at 647 (quoting <u>Richmond, Fredericksburg & Potomac</u>, 945 F.2d at 768).  While not converting a defendants Rule 12(b)(1) motion to one for summary judgment, the district court "should apply the standard applicable to a motion for summary judgment, under which the nonmoving party must set forth specific facts beyond the pleadings to show that a genuine issue of material fact exists."  <u>Richmond, Fredericksburg & Potomac</u>, 945 F.2d at 768.  The moving party should prevail "only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law."  <u>Id.</u>

2. Section 309(g)(6)

Enacted in 1987, section 309(g) of the CWA is titled

"[a]dministrative penalties." 33 U.S.C. § 1319(g). After consultation with the state in which the violation occurs, section 309(g)(1)(A) authorizes the administrator of the EPA to assess civil penalties upon finding that any person has violated any of sections 301, 302, 306, 307, 308, 318 or 405 of the CWA, or has violated "any permit condition or limitation implementing any such sections" in a permit issued under section 402 by the administrator or by a state. 33 U.S.C. § 1319(g)(1)(A). Section 309(g)(2) provides for the imposition of either class I or class II civil penalties. 33 U.S.C. § 1319(g)(2). "Class I penalties may not exceed $10,000 per day up to an aggregate penalty of $25,000. Class II penalties may not exceed $10,000 per day up to an aggregate penalty of $125,000." Paper, Allied-Indus., Chem. & Energy Workers Int'l Union v. Cont'l Carbon Co., 428 F.3d 1285, 1294 (10th Cir. 2005) (citing 33 U.S.C. § 1319(g)(2)). Though the form of the hearing varies, before issuing an order assessing class I or II civil penalties, the person to whom the administrator proposes to issue such an order is entitled to written notice and the opportunity for a hearing. 33 U.S.C. §§ 1319(g)(2)(A) and (B); see S. Pines Assocs. v. United States, 912 F.2d 713, 715 (4th Cir. 1990) ("[w]hen EPA proceeds under section 309(g), the violator is entitled to a hearing before the agency .

. . ."[9]  Section 309(g)(3) sets forth certain considerations the administrator is to take into account in determining the amount of the penalty.  33 U.S.C. § 1319(g)(3).

Section 309 provides for significant public participation in the administrative penalty assessment process. Under the heading "[r]ights of interested persons," section 309(g)(4) provides that "before issuing an order assessing a civil penalty under this subsection the Administrator . . . shall provide the public with notice of and reasonable opportunity to comment on" the proposed order.  33 U.S.C. § 1319(g)(4)(A).  Any person who comments on a proposed penalty assessment "shall be given notice of any hearing" and afforded "a reasonable opportunity to be heard and to present evidence."  33 U.S.C. § 1319(g)(4)(B).  If the assessed party does not elect the option

---

[9] Prior to the imposition of a class I civil penalty, the administrator "shall give to the person to be assessed such penalty written notice of the Administrator's . . . proposal to issue such order and the opportunity to request, within 30 days of the date the notice is received by such person, a hearing on the proposed order.  33 U.S.C. § 1319(g)(2)(A).  Except as otherwise provided by section 309(g), class II penalties "shall be assessed and collected in the same manner, and subject to the same provisions, as in the case of civil penalties assessed and collected after notice and opportunity for a hearing on the record in accordance with . . . [5 U.S.C. § 554]."  33 U.S.C. § 1319(g)(2)(B).  See generally 40 C.F.R. §§ 21.1 though .52 (rules of practice for administrative assessment of civil penalties under the CWA and other enactments).

of a hearing, any person who commented on the proposed assessment may petition for a hearing within thirty days of the issuance of the penalty order.  33 U.S.C. § 1319(g)(4)(C).  If the evidence presented in support of the petition for a hearing "is material and was not considered in the issuance of the order," the administrator "shall immediately set aside . . . [the] order and provide a hearing . . . ."  Id.  In the event a hearing is refused, the administrator "shall provide to the petitioner, and publish in the Federal Register, notice of and the reasons for such denial."  Id.

EPA penalty orders are also subject to judicial review. Under section 308(g)(8), any person against whom an administrative penalty is assessed, or any person who commented on the proposed assessment, has the right to appeal the penalty order.  33 U.S.C. § 1319(g)(8).  Appeals must be noticed within thirty days of issuance of the order, and are made to either the relevant federal district court, or court of appeals, depending on whether a class I or II penalty is assessed.  33 U.S.C. § 1319(g)(8)(A) and (B).  The assessment of a penalty is subject to review for abuse of discretion.  33 U.S.C. § 1319(g)(8).  Penalty orders become final thirty days after issuance unless judicial review is sought or a hearing is requested by a person who

24

submitted a comment.  33 U.S.C. § 1319(g)(5).  If the request for a hearing is denied, the order becomes final thirty days thereafter.  Id.

At the center of this dispute is section 309(g)(6). Titled, "[l]imitation on actions under other sections," section 309(g)(6)(A) provides:

> Action taken by the Administrator . . . under this subsection shall not affect or limit the Administrator's . . . authority to enforce any provision of this chapter; except that any violation--
> (i) with respect to which the Administrator . . . has commenced and is diligently prosecuting an action under this subsection,
> (ii) with respect to which a State has commenced and is diligently prosecuting an action under a State law comparable to this subsection, or
> (iii) for which the Administrator . . . or the State has issued a final order not subject to further judicial review and the violator has paid a penalty assessed under this subsection, or such comparable State law, as the case may be,
> shall not be the subject of a civil penalty action under subsection (d) of this section or section 1321(b) of this title or section 1365 of this title.

33 U.S.C. § 1319(g)(6)(A).  By its terms, section 309(g)(6)(A)(ii) strips district courts of jurisdiction over section 505 citizen suits when three requirements are met: "First, the state must have "commenced" an enforcement procedure against the polluter.  Second, the state must be "diligently prosecuting" the enforcement proceedings.  Finally, the state's

25

statutory enforcement scheme must be "comparable" to the federal scheme promulgated in 33 U.S.C. § 1319(g)." McAbee v. City of Fort Payne, 318 F.3d 1248, 1251 (11th Cir. 2003) (internal citations omitted); see also Friends of Milwaukee's Rivers v. Milwaukee Metro. Sewerage Dist., 382 F.3d 743, 755 (7th Cir. 2004) (same). Cf. Cont'l Carbon Co., 428 F.3d at 1289 (noting that section 309(g)(6)(A)(ii) "deprives federal courts of jurisdiction over CWA citizen enforcement actions when a state has commenced and is diligently prosecuting the same violations under a state law 'comparable' to subsection 1319(g)."). As applied to citizen suits under section 505(a)(1), however, section 309(g)(6)(A)(ii) admits of certain exceptions. Pursuant to section 309(g)(6)(B):

> The limitations contained in subparagraph (A) on civil penalty actions under section 1365 of this title shall not apply with respect to any violation for which--
>     (i) a civil action under section 1365(a)(1) of this title has been filed prior to commencement of an action under this subsection, or
>     (ii) notice of an alleged violation of section 1365(a)(1) of this title has been given in accordance with section 1365(b)(1)(A) of this title prior to commencement of an action under this subsection and an action under section 1365(a)(1) of this title with respect to such alleged violation is filed before the 120th day after the date on which such notice is given.

33 U.S.C. § 1319(g)(6)(B).

26

Powellton contends that the WVDEP had commenced and was diligently prosecuting an administrative enforcement action under state law comparable to Section 309(g) prior to the first NOI being sent on August 27, 2008.  Thus, according to Powellton, by virtue of section 309(g)(6)(A)(ii) the court lacks subject matter jurisdiction over plaintiffs' CWA claims to the extent such claims seek to redress violations of Powellton's three WV/NPDES permits covered by the consent order entered on October 16, 2008. (Mem. in Supp. Partial Mot. to Dismiss at 8-18).

In seeking to avoid the preclusive force of section 309(g)(6)(A)(ii), the plaintiffs look first to section 309(g)(6)(B)(ii).  They contend that under West Virginia law, and for purposes of sections 309(g)(6)(A)(ii) and (B)(ii), the WVDEP's enforcement action did not commence until the draft consent order was issued on August 29, 2009.  The argument goes that because plaintiffs sent the NOI prior to the commencement of any administrative enforcement action by the WVDEP, and suit was filed within the sixty to one-hundred and twenty day time frame mandated by sections 505(b)(1)(A) and 309(g)(6)(B)(ii), section 309(g)(6)(A)(ii) does not apply and the court possesses jurisdiction over all claimed WV/NPDES permit violations.  (Resp. to Partial. Mot. to Dismiss at 4-9).  Plaintiffs argue next that

27

even if the WVDEP had commenced an administrative enforcement action before the NOI was sent, the action was not diligently prosecuted by the WVDEP.  (Id. at 11-13).  Plaintiffs' final argument is that the scheme in place under West Virginia law for the administrative assessment of civil penalties is not comparable to section 309(g).  (Id. at 13-18).   Because the court concludes that West Virginia law is not "comparable" to section 309(g), plaintiffs' arguments as to whether the WVDEP had commenced and were diligently pursuing an administrative enforcement action need not be addressed.[10]

        The United States Supreme Court has observed that "[t]he bar on citizen suits when governmental enforcement action is under way suggests that the citizen suit is meant to supplement rather than to supplant governmental action." Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., 484 U.S. 49, 60 (1987).  Section 101(b) of the CWA provides that, "[i]t is the policy of the Congress to recognize, preserve, and protect

_____

        [10] Plaintiffs also argue that section 309(g)(6)(A)(ii) does not preclude claims for injunctive relief, and that even if some of the CWA claims for civil penalties in the complaint are precluded, the scope of such preclusion is limited.  (Resp. to Partial Mot. to Dismiss at 10-11 and 18-19).   As with plaintiffs' arguments as to commencement and diligence, these arguments need not be addressed inasmuch as the court concludes that section 309(g)(6)(A)(ii) does not preclude any of plaintiffs' claims.

the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution . . . ."  33 U.S.C. § 1251(b). In light of these considerations, courts applying section 309(g)(6)(A)(ii) and determining whether state law is "comparable" to section 309(g), have been "fairly deferential to state law and tend to find comparability."  Cont'l Carbon Co., 428 F.3d at 1293.  Yet, the amount of deference afforded varies between the two standards that have developed in the circuit courts of appeal.

Most deferential to state law is the "overall comparability" standard, which finds its genesis in North & South Rivers Watershed Ass'n v. Town of Scituate, 949 F.2d 552 (1st Cir. 1991).  Offering a broad understanding of the impetus behind section 309(g)(6)(A)(ii), Scituate states that "[t]he focus of the statutory bar to citizen's suits is not on state statutory construction, but on whether corrective action already taken and diligently pursued by the government seeks to remedy the same violations as duplicative civilian action."  949 F.2d at 556. Finding the Massachusetts statutory scheme in question comparable to section 309(g), the court held that for state law to satisfy the comparability requirement of section 309(g)(6)(A)(ii) "[i]t is enough that the . . . [state] statutory scheme, under which

the State is diligently proceeding, contains penalty assessment
provisions comparable to the Federal Act, that the State is
authorized to assess those penalties, and that the overall scheme
of the two acts is aimed at correcting the same violations,
thereby achieving the same goals." Id.[11]  The court rebuffed
appellant Watershed Association's argument that the opportunity
for public participation under the Massachusetts scheme was not
comparable to section 309(g)(4) by stating in a footnote that
"[s]o long as the provisions in the State Act adequately
safeguard the substantive interests of citizens in enforcement
actions, the rights of notice and public participation found in
the State Act are comparable to those found in the Federal Act."
Id. at 556 n.7).

        Like the First Circuit in Scituate, the Fifth, Sixth
and Eighth Circuits have all embraced forms of the "overall

---

        [11] Despite the fact section 309(g)(6)(A)(ii) states that
citizen suits are precluded where the state has commenced, and is
diligently prosecuting, an action "under a State law comparable
to this subsection," the First Circuit in Scituate does not
require the state enforcement authority to actually proceed under
the state provision authorizing the imposition of monetary
penalties.  449 F.2d at 556.  For the bar on citizen suits to
apply, state law need only provide for the imposition of such a
penalty.  Id.  Contra Citizens for a Better Env't v. Union Oil
Co. of Cal., 83 F.3d 1111, (9th Cir. 1996) ("the penalty at issue
must have been assessed under that provision of state law that is
comparable to § 1319(g).").

comparability" standard.  See Lockett v. Env't Prot. Agency, 319 F.3d 678, 684 (5th Cir. 2003) ("We must therefore determine if the Louisiana statute 'affords significant participation' and 'provides interested citizens a meaningful opportunity to participate at significant stages of the decision-making process."); Jones v. City of Lakeland, 224 F.3d 518, 523 (6th Cir. 2000) ("the court . . . must decide if the overall State regulatory scheme affords interested and/or adversely affected citizens the safeguard of a meaningful opportunity to participate in the administrative enforcement process."); Ark. Wildlife Fed'n v. ICI Americas, Inc., 29 F.3d 376, 381 (8th Cir. 1994) ("The common thread running through these cases is a finding that the overall regulatory scheme affords significant citizen participation . . . .  We agree with the reasoning in Scituate that the comparability requirement may be satisfied so long as the state law contains comparable penalty provisions which the state is authorized to enforce, has the same overall enforcement goals as the federal CWA, provides interested citizens a meaningful opportunity to participate at significant stages of the decision-making process, and adequately safeguards their legitimate substantive interests.").

Originating in McAbee v. City of Fort Payne, 318 F.3d

31

1248 (11th Cir. 2003), the "rough comparability" standard imposes a more rigorous comparability requirement, and therefore affords states less deference.  In <u>McAbee</u> the Eleventh Circuit observed that section 309(g) can be divided into "three classes of provisions," namely: "penalty-assessment," "public-participation" and "judicial-review."  <u>McAbee</u>, 318 F.3d at 1254.  While pointing out that the text of section 309(g)(6)(A) suggests "that it is appropriate to compare all three classes of provisions," the court conceded that the "statute is not clear about whether courts should (1) insist that each class of state-law provisions be roughly comparable to its corresponding class of federal provisions or (2) perform a balancing test that compares the overall effect of a state statutory regime against the overall effect of the federal CWA."  <u>Id.</u>  While acknowledging that "the secondary nature of citizens suits and the deference that should be afforded state agencies" cut in favor of "adopting the loose, some might say nebulous" overall comparability standard, the court found other considerations to be more compelling.  <u>Id.</u> at 1255.

    <u>McAbee</u> noted first that "requiring comparability between each class of provisions makes § 1319(g)(6) easier to apply" inasmuch as "an 'overall' balancing test for comparability

. . . [requires judges] to weigh incommensurable values." Id.
In a similar vein, the court noted next that requiring "rough
comparability between each class of provisions . . . reduces
uncertainty not only for courts but also for potential litigants,
state administrative agencies, and state legislatures." Id.
Finally, while admitting that the most reliable indicator of
congressional intent is the language of the statute, the court
found the legislative history of the 1987 amendments to the CWA
to be supportive of "requiring rough comparability between each
class of provisions." Id. at 1255-56. Thus, the court held
"that for state law to be 'comparable,' each class of state law
provisions must be roughly comparable to the corresponding class
of federal provisions." Id. at 1256. In addition to the
Eleventh Circuit, the rough comparability standard has also been
adopted, in 2005, by the Tenth Circuit. See Cont'l Carbon Co.,
428 F.3d at 1294 ("we hold that for state law to be 'comparable,'
under 33 U.S.C. § 1319(g)(6)(A)(ii), each category of state-law
provisions -- penalty assessment, public participation, and
judicial review -- must be roughly comparable to the
corresponding class of federal provisions.").

        Our court of appeals has not adopted a measure by which
to judge comparability under section 309(g)(6)(A)(ii), and has

33

never discussed the merits of either the overall or rough

comparability standards.  The decision of the Fourth Circuit in

United States v. Smithfield Foods, Inc., 191 F.3d 516, 526 (4th

Cir. 1999), affirming the "reasoning and ruling" of the district

court makes clear, however, that West Virginia law is not

sufficiently comparable to section 309(g).

         In Smithfield Foods the EPA commenced a civil action

under sections 309(b) and (d) of the CWA, 33 U.S.C. § 1319(b) and

(d), seeking injunctive relief and civil penalties from three

related defendants for, among other things, violations of the

effluent limitations in a NPDES permit issued by the Commonwealth

of Virginia.  United States v. Smithfield Foods, Inc., 965 F.

Supp. 769, 779 (E.D. Va. 1997).[12]  The defendants argued that

because Virginia authorities had commenced and were diligently

prosecuting an action under state law comparable to section

309(g) the government's claims were precluded by section

─────────────

         [12] Sections 309(b) and (d) authorize the EPA to commence a
civil action seeking, respectively, injunctive relief and civil
penalties for among other things, violations of the terms of
NPDES permits.  33 U.S.C. § 1319(b) and (d); see also Gwaltney,
484 U.S. at 58 ("Section 1319 [§ 309] does not intertwine
equitable relief with the imposition of civil penalties.  Instead
each kind of relief is separably authorized in a separate and
distinct statutory provision. Subsection (b), providing
injunctive relief, is independent of subsection (d), which
provides only for civil penalties.") (quoting Tull v. United
States, 481 U.S. 412, 425 (1987)).

309(g)(6)(A)(ii).  Virginia law, however, did not afford state
administrators the authority to unilaterally impose civil
penalties.  Instead, administrative penalties could only be
assessed with the consent of the violator.  Id. at 792.

     The district court first held that section
309(g)(6)(A)(ii) only applies to civil penalty actions and
therefore the EPA's claim for injunctive relief was not
precluded.  Id. at 791.[13]  Proceeding to analyze the comparability
of Virginia law and section 309(g), the court cited to Scituate
for the proposition that "[t]he proper focus in determining
comparability is on the substance of the law, not its form; the
comparability determination should not turn 'on the logistical
happenstance of statutory drafting.'" Id. at 791 (quoting
Scituate, 949 F.2d at 556).  The court accordingly agreed with
the defendants that in determining whether state and federal law
are comparable "it should compare Section 309(g) to the *entire*
state enforcement scheme."  Id.

_____

[13] The circuits are split on whether section
309(g)(6)(A)(ii) bars claims for injunctive relief and civil
penalties, or only claims for civil penalties.  Compare Ark.
Wildlife Fed'n, 29 F.3d at 282-83 (bar applies to both civil
penalties and injunctive relief), and Scituate, 949 F.2d at 557-
58) (same), with Cont'l Carbon Co., 428 F.3d at 1297-1300 (bar
applies only to civil penalties).

But the court's agreement with the defendants was
limited.  Noting that section 309(g) is titled "Administrative
penalties," and that it "*authorizes* the EPA to assess
*administrative penalties* for violations of the Act or a permit
condition or limitation," the court reasoned that "a state law is
only comparable to Section 309(g), if it *authorizes* the state to
assess *administrative penalties* for violations of the Act or a
permit."  Id. at 792.  According to the court, "[a] penalty
provision requiring the consent of the violator does not have the
same 'teeth' to encourage enforcement as Section 309(g)."  While
recognizing "that it is important to grant state enforcement
agencies latitude to pursue the remedies they deem most effective
in furthering the goals" of the CWA, the court held that
"Virginia law, *requiring the consent of the violator to the
penalties, does not authorize the imposition of administrative
penalties* in a manner comparable to Section 309(g).  Accordingly,
the United States is not barred herein from bringing an
independent penalty action against defendants."  Id. at 792-93.[14]
On appeal, the Fourth Circuit "concur[ed] with the district court
that . . . Virginia's enforcement scheme is not sufficiently

---

[14] The court also found Virginia's public participation
provisions to be insufficiently comparable with section 309(g).
Smithfield Foods, 965 F. Supp. at 793-95.

36

comparable to § 309(g) to bar the EPA from bringing its own independent penalty action," and thus rejected the defendants' "claims of error[,] . . . affirm[ing] the district court's reasoning and ruling on liability." <u>Smithfield Foods</u>, 191 F.3d at 526.

Like the Virginia enforcement scheme at issue in <u>Smithfield Foods</u>, West Virginia law does not empower the WVDEP to unilaterally assess civil penalties. W. VA. CODE § 22-11-22(b) authorizes and directs the WVDEP "to propose, for legislative promulgation, rules . . . to establish a mechanism for the administrative resolution of violations set forth in this section though consent order or agreement." Pursuant to this authorization, and with the approval of the West Virginia legislature, the WVDEP has promulgated W. VA. CODE R. § 47-1-1 through 7 which "establishes a procedure for the resolution of enforcement action and the assessment of civil penalties in lieu of the institution of a civil action . . . ." W. VA. CODE R. § 47-1-1.1.

Pursuant to the rule, the secretary of the WVDEP is authorized to institute "[a]dministrative [p]roceedings," defined as "those proceedings, undertaken pursuant to this Rule, by the Secretary upon his decision to <u>attempt to resolve alleged</u>

violations of the Water Pollution Control Act and its rules," by a "responsible party."  W. VA. CODE R. § 47-1-2.2 (emphasis added).[15]  Within ten days of receiving notification of the secretary's intent to institute administrative proceedings the responsible party must respond and indicate "whether it shall participate or refuses to participate in the administrative proceeding."  W. VA. CODE R. § 47-1-4.4.  Failure to respond within ten days is "considered refusal to participate in the process." Id.  If the responsible party refuses to participate in the administrative proceedings, or fails to respond within ten days, the administrative penalty process comes to an end and the WVDEP must either seek to assess a penalty through the courts or forgo the imposition of a penalty.  See W. VA. CODE § 22-11-22(a) (authorizing the imposition of civil penalties through civil action).  Even if the alleged violator initially agrees to participate, "[t]he administrative proceeding may be terminated at any time and for any reason by any party involved in the proceeding."  W. VA. CODE R. § 47-1-5.4.  In the event the alleged violator agrees to participate in administrative proceedings, and does not back out, "resolution of the alleged violations . . .

_____

[15] W. VA. CODE R. § 47-1-2.4 defines "[r]esponsible [p]arty" as "a permittee or any person alleged to have violated the Act or its Rules."

shall be by Consent Decree entered into by the responsible party and the Secretary."  W. Va. Code R. § 47-1-5.3.

West Virginia law authorizing the WVDEP to "attempt to resolve alleged violations" through administrative proceedings is markedly different from section 309(g) which authorizes the EPA to "assess a class I civil penalty or a class II civil penalty." Compare W. Va. Code R. § 47-1-2.2 with 33 U.S.C. § 1319(g)(1).  As stated in Smithfield Foods, "[a] penalty provision requiring the consent of the violator does not have the same 'teeth' to encourage enforcement as Section 309(g)."  965 F. Supp. at 792. Further, because W. Va. Code R. § 47-1-5.4 allows alleged violators to terminate administrative proceedings "at any time and for any reason," West Virginia law also provides violators with ample opportunity to attempt to avoid citizen suits by manipulation of the West Virginia administrative enforcement process.  Were the court to find W. Va. Code R. § 47-1-1 through 7 comparable to section 309(g), a conniving violator could simply agree to the commencement of administrative proceedings in order to deprive federal district courts of jurisdiction under section 309(g)(6)(A)(ii) with no intention of ever entering into a consent decree.  Such manipulation would completely undermine the objective of section 309(g)(6)(A)(ii) to avoid "duplicative

civilian action[s]," <u>Scituate</u>, 942 F.2d at 556, because the West Virginia enforcement action would be nothing more than an illusion.  <u>See</u> <u>generally</u> Jeffery G. Miller, <u>Theme and Variations in Statutory Preclusions Against Successive Environmental Enforcement Actions by EPA and Citizens: Part One: Statutory Bars in Citizen Suit Provisions</u>, 29 HARV. ENVTL. L. REV. 1, 34 (2004) ("violators do solicit ineffective state action as a sanctuary from compliance actions").

Powellton seeks to distinguish <u>Smithfield Foods</u> by pointing out that the plaintiff in the case was the EPA, as opposed to a private citizen.  Yet, this fact does nothing to distinguish <u>Smithfield Foods</u> because the terms of section 309(g)(6)(A) apply with the same force to claims brought by the EPA under section 309(d) as they do to claims brought by private citizens under section 505.  <u>See</u> Miller, <u>supra</u>, at 34 ("the same preclusion device bars successive EPA actions as well as successive citizen actions").  Whether claims of the EPA or a private citizen are alleged to be precluded simply has no effect on whether state law is comparable to section 309(g).

Powellton also contends that <u>Smithfield Foods</u> is distinguishable because "Virginia's administrative enforcement program had proven ineffective to extract civil penalties from

the particular violator [the] USEPA was suing, as well as other violators." (Reply to Resp. to Partial Mot. to Dismiss at 15). Neither the district, nor the circuit court mentioned the effectiveness of Virginia's enforcement efforts in concluding the Virginia law was not comparable to section 309(g). Indeed, while the effectiveness of state enforcement efforts might be relevant to the diligence of the state authority prosecuting an enforcement action, it has no bearing on whether state law is comparable to section 309(g).

In light of <u>Smithfield Foods</u>, and because West Virginia law does not provide for the assessment of administrative penalties without the violator's consent, the court finds that West Virginia law is not comparable to section 309(g). Plaintiffs' CWA claims are not precluded by section 309(g)(6)(A)(ii) and the court is possessed of subject matter jurisdiction.

IV.

Through their SMCRA claims, plaintiffs seek to enforce SMCRA and WVSCMRA performance standards prohibiting surface mining operations from violating effluent limitations in CWA

41

permits and from causing material damage to the hydrologic balance outside the permit area.  Powellton argues that in asserting these claims plaintiffs construe SMCRA "as superceding, amending, modifying or repealing" the CWA in contravention of SMCRA section 702(a)(3), 30 U.S.C. § 1292(a)(3).  Thus, according to Powellton, plaintiffs' SMCRA claims must be dismissed.

1. Federal Rule of Civil Procedure 12(b)(6)

        Federal Rule of Civil Procedure 8(a)(2) requires that a pleader provide "a short and plain statement of the claim showing . . . entitle[ment] to relief."  Fed. R. Civ. P. 8(a)(2); Erickson v. Pardus, 127 S. Ct. 2197, 2200 (2007).  Rule 12(b)(6) correspondingly permits a defendant to challenge a complaint when it "fail[s] to state a claim upon which relief can be granted . . . ."  Fed. R. Civ. P. 12(b)(6).

        The required "short and plain statement" must provide "'fair notice of what the . . . claim is and the grounds upon which it rests.'"  Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 545 (2007) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957), overruled on other grounds, Twombly, 550 U.S. at 563); see also Anderson v. Sara Lee Corp., 508 F.3d 181, 188 (4th Cir. 2007).

42

In order to survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." <u>Ashcroft v. Iqbal</u>, 129 S. Ct. 1937, 1949 (2009) (quoting <u>Twombly</u>, 550 U.S. at 570).

Application of the Rule 12(b)(6) standard requires that the court "'accept as true all of the factual allegations contained in the complaint . . . .'" <u>Erickson</u>, 127 S. Ct. at 2200 (quoting <u>Twombly</u>, 127 S. Ct. at 1965); <u>see</u> <u>also</u> <u>South Carolina Dept. Of Health And Environmental Control v. Commerce and Industry Ins. Co.</u>, 372 F.3d 245, 255 (4th Cir. 2004) (quoting <u>Franks v. Ross</u>, 313 F.3d 184, 192 (4th Cir. 2002)).  The court must also "draw[] all reasonable . . . inferences from th[e] facts in the plaintiff's favor . . . ." <u>Edwards v. City of Goldsboro</u>, 178 F.3d 231, 244 (4th Cir. 1999).

2. Section 702(a)

Pursuant to its delegated authority, and as required by section 503(a) of SMCRA, 30 U.S.C. § 1253(a), West Virginia has adopted numerous performance standards governing surface coal mining operations within the state.  <u>See</u> <u>generally</u> W. Va. Code R. §

43

38-2-14. One such standard requires that "[a]ll surface mining and reclamation activities shall be conducted to minimize the disturbance of the hydrologic balance within the permit and adjacent areas . . . ." W. Va. Code R. § 38-2-14.5; see also 30 C.F.R. § 816.41 (federal performance standard mandating the same). Another, titled "[e]ffluent [l]imitations," provides that,

> [d]ischarge from areas disturbed by surface mining shall not violate effluent limitations or cause a violation of applicable water quality standards. The monitoring frequency and effluent limitations shall be governed by the standards set forth in an NPDES permit issued pursuant to W. Va. Code § 22-11 et seq., the Federal Water Pollution Control Act as amended, 33 U.S.C. 1251 et. seq. and the rules and regulations promulgated thereunder.

W. Va. Code R. § 38-2-14.5.b; see also 30 C.F.R. § 816.42 (federal performance standard requiring that "[d]ischarges of water from areas disturbed by surface mining activities shall be made in compliance with all applicable State and Federal water quality laws and regulations and with the effluent limitations for coal mining promulgated by the U.S. Environmental Protection Agency set forth in 40 CFR Part 434."). As noted, these performance standards are incorporated into, and are conditions of, every WVSCMRA permit issued by the WVDEP. See supra at 8. Plaintiffs contend that in violating the effluent limitations of its three WV/NPDES permits, Powellton also violated the above described

state and federal performance standards, and consequently the
terms of its four WVSCMRA permits.  (First Am. Compl. ¶¶ 82-84,
101-103, 121-122).

        As Powellton points out, section 702(a) of SMCRA
provides that,

> [n]othing in this chapter shall be construed as
> superseding, amending, modifying, or repealing the
> Mining and Minerals Policy Act of 1970 (30 U.S.C. 21a),
> the National Environmental Policy Act of 1969 (42
> U.S.C. 4321-47), or any of the following Acts or with
> any rule or regulation promulgated thereunder,
> including, but not limited to--
>
>     . . . .
>
>         (3) The Federal Water Pollution Control Act
>         (79 Stat. 903), as amended, the State laws
>         enacted pursuant thereto, or other Federal
>         laws relating to preservation of water
>         quality.

30 U.S.C. § 1292(a)(3).  Powellton argues that because the
performance standards "requiring that SMCRA permittees maintain
compliance with applicable effluent limits does - and cannot -
displace the comprehensive regulatory scheme outlined in the CWA
for the enforcement of those limits," (Mem. in Supp. Partial Mot.
to Dismiss at 19), plaintiffs' SMCRA claims must be dismissed.

        As part of a wide ranging challenge to regulations
passed under SMCRA, in In re Surface Mining Regulation
Litigation, 627 F.2d 1364 (D.C. Cir. 1980) the D.C. Circuit

45

considered whether interim performance standards promulgated by the Secretary of the Interior establishing "effluent limitations and water quality standards for surface and underground mining" transgressed section 702(a) by "superceding, amending, modifying, or repealing" the CWA.  In re Surface Mining, 627 F.2d at 1366. Looking first to the legislative history of section 702, the court stated that "Congress meant exactly what it said in section 702(a)(3) of the Act, that where there is an overlap of regulation the Surface Mining Act is not to be interpreted as altering in any fashion the [CWA]."  Id.  The court determined that where there is a "'regulatory gap,' the Secretary may issue effluent regulations without regard to EPA practices so long as he is authorized to do so under the Surface Mining Act."  Id. at 1367.  The court cautioned, however, that "where the Secretary's regulations of surface coal mining's hydrologic impact overlaps with the EPA's, the Act expressly directs that the . . . [CWA] and its regulatory framework are to control so as to afford consistent effluent standards nationwide."  Id.  Considering the regulations in question, the court held that "to the extent that the EPA variance from effluent limitations applies to surface coal mining operations, it must be included with the Secretary's interim regulations in order to avoid inconsistent water quality standards in contravention of section 702(a)(3) of the Surface

46

Mining Act."  Id. at 1368.

        As recognized in In re Surface Mining, in enacting
SMCRA Congress clearly understood, and accepted, that there would
be some overlap between SMCRA and the CWA.  Indeed, one of the
"[g]eneral performance standards" made applicable to "all surface
coal mining . . . operations" by section 515(b) of SMCRA requires
such operations to "minimize the disturbances to the prevailing
hydrologic balance at the mine-site and in associated offsite
areas and to the quality and quantity of water in surface and
ground water systems both during and after surface coal mining
operations and during reclamation . . . ."  30 U.S.C. §
1265(b)(10).  This court has previously noted that SMCRA
regulations violate section 702(a) only if they are "inconsistent
with the CWA."  Kentuckians for the Commonwealth, Inc. v.
Rivenburgh, 204 F. Supp. 2d 927, 941 (S.D. W. Va. 2002), rev'd on
other grounds, 317 F.3d 425 (4th Cir. 2003); see also Pa. Coal
Mining Assoc. v. Watt, 563 F. Supp. 741, 746 (M.D. Pa. 1983) ("As
a result, the Secretary of the Interior has been prohibited from
enforcing regulations that are stricter than, or inconsistent
with, those promulgated earlier by the EPA under the Clean Water
Act."); cf. Ohio River Envtl. Coal., Inc. v. Hominy Creek Pres.
Ass'n, 473 F.3d 94, 101 (4th Cir. 2006) ("Congress explicitly

47

disclaimed any intent to supercede or preempt [environmental and mining] statutes with potentially overlapping provisions.") (citing 30 U.S.C. § 1292(a)).

Powellton does not challenge the propriety of the requirement that "[d]ischarge from areas disturbed by surface mining shall not violate effluent limitations or cause a violation of applicable water quality standards." W. Va. Code R. § 38-2-14.5.b.  Indeed, the express incorporation of CWA effluent limitations into SMCRA and WVSCMRA performance standards was presumably done to comply with section 702(a) by avoiding any inconsistency with the CWA.  Instead, Powellton argues that a SMCRA citizen suit under section 520(a)(1) is not "the appropriate vehicle for enforcing violations of CWA effluent limitations."  (Mem. in Supp. Partial Mot. to Dismiss at 18). Thus, the question is whether plaintiffs claims under SMCRA alter, "in any fashion," the CWA.  <u>In re Surface Mining</u>, 627 F.2d at 1366.

Powellton's assertion that plaintiffs seek to "enforce WV/NPDES violations through a SMCRA citizen suit" goes too far. (Reply to Resp. to Partial Mot. to Dismiss at 19).  W. Va. Code R. § 38-2-14.5.b, and Powellton's WVSCMRA permits impose an independent obligation to comply with all relevant effluent

48

limitations, and it is this independent obligation the plaintiffs seek to enforce.  That the effluent limitations at issue are contained in Powellton's WV/NPDES permits does not change the independent nature of the plaintiffs' SMCRA claims.

Yet, the court can conceive of situations where a SMCRA citizen suit to compel compliance with the terms of a SMCRA permit incorporating the effluent limitations of an NPDES permit might be deemed to alter the CWA.  For instance, section 505(b)(1)(b) of the CWA precludes CWA citizen suits based on alleged violations of effluent limitations in a NPDES permit "if the Administrator or State has commenced and is diligently prosecuting a civil or criminal action to require compliance [with the permit]."  33 U.S.C. § 1365(b)(1)(B).  In such a case, to allow a SMCRA citizen suit seeking to compel compliance with a SMCRA permit incorporating the same effluent limitations to proceed could be seen as "superseding, amending, modifying, or repealing" the CWA in contravention of section 702(a).  But such is not the case here.  As determined above, plaintiffs' CWA claims based on Powellton's alleged violations of the effluent limitations in its three WV/NPDES permits are not precluded. Plaintiffs CWA claims seek, among other things, injunctive relief compelling Powellton to comply with the terms of its three

49

WV/NPDES permit; plaintiffs SMCRA claims seek injunctive relief compelling compliance with the terms of its four WVSCMRA permits which incorporate the effluent limitations contained the three WV/NPDES permits.  In practical effect, the relief sought by the plaintiffs under SMCRA is duplicative of that sought under the CWA, and allowing SMCRA claims to proceed can not be said to, "alter[] in any fashion the [CWA]."  <u>In re Surface Mining</u>, 627 F.2d at 1366.[16]

Further, were Powellton's proffered application of section 702(a) to be accepted, W. Va. Code R. § 38-2-14.5.b and its federal counterpart at 30 C.F.R. § 816.42 would be unenforceable by both private citizens as well as state and federal regulators.[17]  Indeed, any provisions of SMCRA, or the regulations

_____

[16] Powellton concedes that the relief by the plaintiffs under SMCRA "is entirely duplicative of the injunctive relief sought in connection with their CWA claims."  (Reply to Resp. to Partial Mot. to Dismiss at 20).

[17] It appears that the Office of Surface Mining Reclamation and Enforcement ("OSM"), the division of the Department of the Interior responsible for implementing SMCRA, has not adopted Powellton's position.  In <u>Cheyenne Sales Co. v. Norton</u>, No. 2:04-cv-74, 2007 WL 773904, at *3 (N.D. W. Va. Mar. 9, 2007), the court upheld the OSM's issuance of "a notice of violation ("NOV") in which . . . [the OSM] cited . . . [a SMCRA permit holder] for violating federal permanent program regulation 30 C.F.R. § 816.42 and West Virginia surface mining regulation § 38-2-14.5(b)."  Pursuant to the NOV, the holder of the SMCRA permit was required "to install, operate, and maintain treatment facilities so that any water discharged from the site would comply with the effluent

promulgated thereunder, which overlap with the environmental enactments referred to in section 702(a) would be unenforceable.

Congress, though, clearly intended SMCRA to regulate the environmental impact of mining.  One of the express purposes of SMCRA is to "assure that surface mining operations are so conducted as to protect the environment."  30 U.S.C. § 1202(d). Section 515, titled, "[e]nvironmental protection performance standards," sets forth no less than twenty-five "[g]eneral performance standards . . . applicable to all surface mining and reclamation operations . . . ."  30 U.S.C. § 1265(b).

Congress also clearly intended that these environmental standards be enforced.  Section 518(a) provides that "any permittee who violates any permit condition or who violates any other provision of this subchapter, may be assessed a civil penalty by the Secretary . . . ."  30 U.S.C. § 1268(a).  Section 503(a) requires states implementing SMCRA to adopt laws providing for "sanctions for violations of State laws, regulations, or conditions of permits concerning surface coal mining and reclamation operations" and for "the effective implementation[], maintenance, and enforcement of a permit system, meeting the

---

limitations in the NPDES permit and 40 C.F.R. Part 434."  Id.

requirements of this subchapter for the regulation[] of surface coal mining and reclamation operations for coal on lands within the State."  30 U.S.C. § 1253(a)(2) and (4).

That "violations of effluent limitations are subject to the comprehensive regulatory programs set forth in the CWA and the WVWPCA" is by itself of little moment.  (Reply to Resp. to Partial Mot. to Dismiss at 20).  Congress intended that the provisions of SMCRA, and the state laws and regulations passed thereunder, be enforced.  Simply because the provision sought to be enforced incorporates, in a consistent manner, standards imposed under the CWA does not mean that enforcement thereof will alter, or "supercede[], amend[], modify[], or repeal[]," the CWA. Plaintiffs have stated a viable claim under SMCRA.

V.


It is accordingly ORDERED that Powellton's partial motion to dismiss be, and it hereby is, denied.

The Clerk is directed to forward copies of this memorandum opinion and order to all counsel of record.


DATED: August 18, 2009

John T. Copenhaver, Jr.
United States District Judge


53