UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

SIERRA CLUB and
ANSTED HISTORIC PRESERVATION
COUNCIL, INC.,

            Plaintiffs

v.                                    Civil Action No. 2:08-1363

POWELLTON COAL COMPANY, LLC,

            Defendant.


MEMORANDUM OPINION AND ORDER


        This action arises under the Federal Water Pollution

Control Act, 33 U.S.C. §§ 1251 through 1387, commonly referred to

as the Clean Water Act, and the Surface Mining Control and

Reclamation Act of 1977 ("SMCRA"), 30 U.S.C. §§ 1201 through

1328.  According to the plaintiffs, between March 1, 2006, and

March 31, 2009, defendant Powellton Coal Company, LLC

("Powellton") accrued at least 6,767 violations of the Clean

Water Act and SMCRA as a result of its unlawful discharges of

pollutants into the waters of the United States.  Pending are the

parties' cross motions for summary judgment.

        On June 18, 2009, plaintiffs Sierra Club and Ansted

Historic Preservation Council, Inc. filed their motion for

1

partial summary judgment on their Clean Water Act claims and for summary judgment on their SMCRA claims.[1]  On June 18, 2009, defendant Powellton Coal Company, LLC filed its motion for summary judgment as to all of plaintiffs' claims.  For the reasons that follow, Powellton's motion is denied.  Plaintiffs' motion is granted in part and denied in part.[2]

I.

Plaintiffs' claims are brought pursuant to the provisions for "citizen suits" found in section 505(a) of the Clean Water Act, 33 U.S.C. § 1365(a), and section 520(a) of SMCRA, 30 U.S.C. § 1270(a).  What follows is an overview of the

---

[1] As discussed further below, the Clean Water Act authorizes citizen plaintiffs to seek civil penalties. It additionally provides courts with factors to consider when determining the amount of civil penalties to be imposed.  As to Powellton's alleged liability for the Clean Water Act violations in Counts 1, 3, and 5, plaintiffs move for summary judgment. They reserve their claims for civil penalties for the next phase of the case. Unlike the Clean Water Act, SMCRA does not authorize the imposition of civil penalties.  Accordingly, plaintiffs seek summary judgment as to the entirety of their SMCRA claims in Counts 2, 4, and 6.

[2] Parts I and II of this order are largely taken from Parts I and II of the court's order of August 18, 2009, denying the defendant Powellton's motion to dismiss.

statutory and regulatory schemes in place under the Clean Water Act and SMCRA.

A. Clean Water Act

The Clean Water Act was enacted "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters."  33 U.S.C. § 1251(a).  To this end, section 301(a) makes the discharge of "pollutants"[3] from a "point source"[4] into the waters of the United States unlawful unless the discharger complies with certain enumerated sections of the Clean Water Act.  One such enumerated provision is section 402, 33 U.S.C. § 1342, which embodies the National Pollution Discharge Elimination System ("NPDES") permit program, "[t]he cornerstone of the Clean Water Act's pollution control scheme . . .." Natural Res. Def. Council, Inc. v. U.S. Envtl. Prot. Agency, 822 F.2d 104, 108 (D.C. Cir. 1987).

The issuance of a NPDES permit does not authorize the recipient to pollute at will.  All NPDES permits authorizing the discharge of pollutants are conditioned upon satisfaction of the

---

[3] See 33 U.S.C. § 1362(6).

[4] See 33 U.S.C. § 1362(14).

applicable requirements of the Clean Water Act. 33 U.S.C. §
1342(a)(1) and (b)(1). Section 301(b)(1) of the Clean Water Act
requires that "every permit contain (1) effluent limitations that
reflect the pollution reduction achievable by using
technologically practicable controls and (2) any more stringent
pollutant release limitations necessary for the waterway
receiving the pollutant to meet 'water quality standards.'"
Piney Run Pres. Ass'n v. County Comm'rs, 268 F.3d 255, 265 (4th
Cir. 2001) (quoting Am. Paper Inst., Inc. v. U.S. Envt'l. Prot.
Agency, 996 F.2d 346, 349 (D.C. Cir. 1993)).[5] NPDES permits also
require the holder to establish and maintain records; install,
use, and maintain monitoring equipment; sample point source
effluent; and submit "discharge monitoring reports" ("DMRs") at
regular intervals specified in the permit. 33 U.S.C. §
1318(a)(4)(A); 40 C.F.R. § 122.41(l)(4). "Noncompliance with a
permit constitutes a violation of the [Clean Water] Act."

---

[5] Section 502(11) of the Clean Water Act defines "effluent
limitation" as "any restriction established by a State or the
Administrator [of the EPA] on quantities, rates, and
concentrations of chemical, physical, biological, and other
constituents which are discharged from point sources into
navigable waters . . . ." 33 U.S.C. § 1362(11). Section
303(a)(3)(a), 33 U.S.C. § 1313(a)(3)(A), requires states to adopt
water quality standards. "A water quality standard (WQS) defines
the water quality goals of a water body, or portion thereof, by
designating the use or uses to be made of the water and by
setting criteria necessary to protect the uses." 40 C.F.R. §
130.3.

Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,
528 U.S. 167, 175 (2000) (citing 33 U.S.C. § 1342(h)).

While the Environmental Protection Agency ("EPA") is
charged with administering the NPDES program, it is empowered to
delegate this authority to individual states.  33 U.S.C. §
1342(b).  Once the EPA approves a state's proposed NPDES program,
the EPA suspends its issuance of NPDES permits as to discharges
subject to the state program.  33 U.S.C. § 1342(c)(1).  On May
10, 1982, the EPA approved West Virginia's NPDES program, 47 Fed.
Reg. 22,363 (May 24, 1982), which is administered by the West
Virginia Department of Environmental Protection ("WVDEP").  See
Water Pollution Control Act, W. Va. Code §§ 22-11-1 through 29.
Permits issued under the West Virginia NPDES program are known as
West Virginia National Pollution Discharge Elimination System
("WV/NPDES") permits.

The EPA, states, and private citizens all play a role
in enforcing the Clean Water Act.  Section 505(a)(1) authorizes
"citizens"[6] to commence a civil action "against any person . . .
who is alleged to be in violation of  . . . an effluent standard
or limitation under this chapter . . .."  Section 505(f)

---

[6] Section 505(g) defines "citizen" as "a person or persons
having an interest which is or may be adversely affected."

5

provides, "[f]or purposes of this section, the term 'effluent standard or limitation under this chapter' means (1) effective July 1, 1973, an unlawful act under subsection (a) of section 1311 of this title [section 301(a)]; . . . [or] (6) a permit or condition thereof issued under section 1342 of this title [section 402] . . . .." Section 505(a) authorizes, "federal courts . . . to enter injunctions and assess civil penalties, payable to the United States Treasury, against any person found to be in violation of 'an effluent standard or limitation' under the Act." Envtl. Conservation Org. v. City of Dallas, 529 F.3d 519, 526 (2008).

While violation of the terms of a NPDES or WV/NPDES permit exposes the permit holder to the possibility of a citizen suit, the right to bring a citizen suit is not without limits. Pursuant to section 505(b), a citizen suit under 505(a)(1) can not be commenced until sixty days after the plaintiff gives notice of the alleged violation to the administrator of the EPA, the state where the alleged violation is occurring, and to the alleged violator.  Section 505(b) provides further that "[n]o action [under section 505(a)] may be commenced . . . if the Administrator or State has commenced and is diligently prosecuting a civil or criminal action in a court of the United

States, or a State to require compliance with the standard, limitation, or order . . ..″  Similarly, section 309(g), which authorizes the EPA to assess administrative penalties for violations of, among other things, the terms of a NPDES permit, precludes citizen suits for violations with respect to which the EPA or a state "has commenced and is diligently prosecuting" an administrative penalty action under section 309(g) or state law "comparable" thereto.[7]  As will be seen, the applicability of section 309(g)(6) to the facts of this action is in sharp dispute.

B. Surface Mining Control and Reclamation Act

SMCRA is a comprehensive statute "enacted to strike a balance between the nation's interests in protecting the environment from the adverse effects of surface coal mining and in assuring the coal supply essential to the nation's energy requirements."  Bragg v. W. Va. Coal Ass'n., 248 F.3d 275, 288 (4th Cir. 2001) (citing 30 U.S.C. § 1202(a),(d),(f)); see also

---

[7] Under section 309(g)(6)(A)(iii), citizen suits are also precluded as to any violation "for which the Administrator, the Secretary [of the Army], or the State has issued a final order not subject to further judicial review and the violator has paid a penalty assessed under this subsection, or such comparable State law, as the case may be . . .."

**Hodel v. Va. Surface Mining & Reclamation Ass'n**, 452 U.S. 264, 269 (1981).  These ends are accomplished through a system of "'cooperative federalism,' in which responsibility for the regulation of surface coal mining in the United States is shared between the U.S. Secretary of the Interior and State regulatory authorities." Bragg, 248 F.3d at 288 (citing H.R. Rep. No. 95-218, at 57 (1977), reprinted in 1977 U.S.C.C.A.N. 593, 595). Under section 503 of SMCRA, once a state's proposed program for the regulation of surface coal mining is approved by the Secretary of the Interior as satisfying SMCRA's minimum requirements, the state assumes "exclusive jurisdiction over the regulation of surface coal mining and reclamation operations" on non-federal lands within the state.  West Virginia received such federal approval in 1981, 30 C.F.R. § 948.10, and its surface mining program is administered by the WVDEP.  See West Virginia Surface Coal Mining Reclamation Act ("WVSCMRA"), W. Va. Code § 22-3-1 through 32a.

Section 506(a), the heart of SMCRA, prohibits surface coal mining by any person "unless such person has first obtained a permit issued by such State pursuant to an approved State program or by the Secretary pursuant to a Federal program . . .." Pursuant to section 515(a), permits issued under either an

8

approved state program or the federal program, "shall require that such surface coal mining operations will meet all applicable performance standards of this chapter, and such other requirements as the regulatory authority shall promulgate."[8] Similarly, the WVSCMRA provides that "[a]ny permit issued by the director pursuant to this article to conduct surface mining operations shall require that the surface mining operations meet all applicable performance standards of this article and other requirements set forth in legislative rules proposed by the director." W. Va. Code § 22-3-13(a).  In turn, W. Va. Code R. § 38-2-3.33c provides that "[t]he permittee shall comply with the terms and conditions of the permit, all applicable performance standards of the Act, and this rule."

Like the Clean Water Act, SMCRA contains a "citizen suits" provision.  Section 520(a) provides that "any person having an interest which is or may be adversely affected may commence a civil action on his own behalf to compel compliance with this chapter . . . against any . . . person who is alleged to be in violation of any rule, regulation, order or permit

---

[8] SMCRA defines "regulatory authority" as "the State regulatory authority where the State is administering this chapter under an approved State program or the Secretary [of the Interior] where the Secretary is administering this chapter under a Federal program." 30 U.S.C. § 1291(22).

issued pursuant to this subchapter . . ..″  Unlike the Clean Water Act, however, section 520(a) of SMCRA does not authorize the imposition of civil penalties; citizens are only allowed to file suit in order to compel compliance with SMCRA.[9]  While, as a general rule, section 520(a) affords a cause of action to compel compliance with performance standards incorporated into SMCRA permits issued by authorized states such as West Virginia,[10] section 702(a) of SMCRA provides that "[n]othing in this chapter shall be construed as superceding, amending, modifying, or repealing″ the Clean Water Act or state laws enacted pursuant to it.

---

[9] SMCRA requires plaintiffs to give notice of alleged violations to the Secretary of the Interior, the state, and the alleged violator sixty days prior to filing suit.  30 U.S.C. § 1270(b)(1)(A).  "[I]f the Secretary [of the Interior] or the State has commenced and is diligently prosecuting a civil action in a court of the United States or a State to require compliance with the provisions of this chapter, or any rule, regulation, order, or permit issued pursuant to this chapter,″ a citizen suit cannot be commenced.  30 U.S.C. § 1270(b)(1)(B).

[10] Surface coal mining permits issued by the WVDEP pursuant to its authority under SMCRA and the WVSCMRA will be referred to as "WVSCMRA permits.″

II.


Powellton is a West Virginia limited liability company doing business in Bickmore, West Virginia.  (First Am. Compl. ¶ 13).  Plaintiffs, the Sierra Club and the Ansted Historic Preservation Council, Inc., are nonprofit organizations committed to the protection of the environment in West Virginia and elsewhere.  (Id. ¶ 12-13).  The first amended complaint states that "[p]laintiffs' members suffer injuries to their aesthetic, recreational, environmental, and/or economic interests as a result of Defendant's unlawful discharge of pollutants."  (Id. ¶ 14).

At all times relevant to this action, Powellton has held WV/NPDES permit number WV 1019449 and WVSCMRA permit number S300301 for its Bridge Fork West Surface Mine; WV/NPDES permit number 1019279 and WVSCMRA permit number S300400 for its Bridge Fork Surface Mine No. 1; and WV/NPDES permit number 1019287 and WVSCMRA permit numbers O300500 and O300700 for its Sugarcamp Loadout and Rich Creek Haulroad.  (Id. ¶¶ 37-38, 44-45, 51-52; Answer to First Am. Compl. ¶¶ 37-38, 44-45, 51-52).  According to the first amended complaint, Powellton's three WV/NPDES permits contain effluent limitations which limit the amount of

11

pollutants, including suspended solids, iron, aluminum and manganese, that Powellton is allowed to discharge into the waters of the United States. (First Am. Comp. ¶ 39-40, 46-47, 53-54). Based on DMRs (discharge monitoring reports) submitted to the WVDEP by Powellton, plaintiffs contend that between March 1, 2006, and March 31, 2009, Powellton accrued thousands of violations of the effluent limitations imposed by its WV/NPDES permits. (Id. ¶¶ 5, 42, 49, 55; Violation Summaries, First Am. Compl., Exs. A, B and C.). Because of Powellton's alleged pattern of violating the effluent limitations in its WV/NPDES permits, and ostensible lack of any meaningful efforts to eradicate the cause of the violations, plaintiffs allege that Powellton is in "continuing and/or intermittent violation of the Clean Water Act and SMCRA." (Id. ¶¶ 43, 50, 56).

A. WV/NPDES Permit Number WV1019449

On September 23, 2004, the DEP issued WVNPDES permit number WV1019449 to Powellton. (Pls.' Mot. Summ. J., Ex. 1). This permit regulates water pollution discharged from Powellton's Bridge Fork West Surface Mine, for which facility Powellton holds Surface Mining Permit S300301. (Id.). Permit WV1019449 limits the concentrations of suspended solids, iron, and aluminum in

12

Powellton's discharges "into unnamed tributaries of/and Bridge Fork of Rich Creek of the Gauley River of the Kanawha River." (Pls.' Mot. Summ. J., Ex. 1 at 2).

The effluent limitations on suspended solids and iron went into effect on the day the permit was issued.  (Pls.' Mot. Summ. J. at 4).  Initially, the WVDEP incorporated a three-year schedule of compliance for aluminum effluent limitations into the permit under which aluminum effluent limitations would not become effective until September 24, 2007.  (Id.).  During the three-year compliance period, Powellton needed only to "report" its discharges to the WVDEP without being subject to aluminum effluent limitations.  (Id.).

On January 9, 2006, the EPA approved new dissolved aluminum criteria that temporarily modified chronic aluminum criterion for all waters other than trout streams.  (Pls.' Mot. Summ. J., Ex. 2 at 1).  On March 27, 2006, WVDEP issued a "Modification Order" to Powellton, by which the agency modified WV/NPDES Permit 1019449 "to extend the compliance deadline for [Powellton's] aluminum effluent limitations to the expiration date" of its permit, being September 23, 2008. (Id.).  On August 2, 2006, WVDEP issued NPDES Modification No. 2 for WV/NPDES Permit 1019449.  (Def.'s Mot. Summ. J., Ex. 2 at 1).

13

Modification No. 2 changed the permit's manganese limits pursuant to Powellton's modification application. (Id.).  The Discharge Limitations and Monitoring Requirements Table attached to Modification No. 2 noted that the total aluminum discharge limitation was "Report Only" from September 23, 2004 until September 23, 2008.  (Id. at 6-21).  It listed aluminum effluent limitations as beginning on September 24, 2008, the day following the permit's expiration.  (Id.).

Plaintiffs allege at least 2,959 days of violations of the effluent limitations in WV/NPDES Permit 1019449 between June 1, 2007, and March 31, 2009.  (Compare Pls.' Mot. Summ. J., Ex. 3 with Pls.' Mot. Summ. J., Ex. 1.  See also First Am. Compl., App. A).  Many of these are alleged aluminum violations that depend on whether the aluminum effluent limitations took effect on September 24, 2007, or were extended by the WVDEP's modification order.

B. WV/NPDES Permit Number WV1019279

On July 25, 2001, WVDEP issued WV/NPDES Permit Number WV1019279 to Powellton.  (Pls.' Mot. Summ. J., Ex. 4 at 1).  WVDEP renewed the permit on March 11, 2005.  (Pls.' Mot. Summ.

14

J., Ex. 5 at 1).  WV/NPDES Permit Number WV1019279 regulates
water pollution discharged from Powellton's Bridge Fork Surface
Mine No. 1, for which facility Powellton holds Surface Mining
Permit S300400. (Id.).  This permit limits the concentrations of
suspended solids, iron, manganese, and aluminum in Powellton's
discharges into Curry Camp Branch of Bridge Fork, Bridge Fork of
Rich Creek, Sugarcamp Branch of Rich Creek, Rich Creek, and all
of the Gauley River of the Kanawha River. (Id.).

        The effluent limitations on suspended solids, iron, and
manganese went into effect on the day the permit was issued.
(Pls.' Mot. Summ. J. at 4).  Like WV/NPDES Permit WV1019449,
Permit 1019279 initially had a "report only" three-year schedule
of compliance for aluminum effluent limitations so that
violations for those limitations would not begin to accrue until
March 12, 2008.  (Pls.' Mot. Summ. J. at 5).  On March 27, 2006,
Powellton received a modification order from the WVDEP extending
the effective date for the WV/NPDES WV1019279 aluminum effluent
limitations until the permit's reissuance.  (Pls.' Mot. Summ. J.,
Ex. 6 at 1).  Significantly, the modification order does not
include several outfalls within its coverage which plaintiffs

indicate incurred numerous aluminum violations.[11]  (Id.).  Whether the modification order effectively extended the permit's original schedule of compliance will be discussed along with the modification order of WV/NPDES Permit WV1019449 in Part C below.

Plaintiffs allege at least 3,361 days of violations of the effluent limitations in WV/NPDES Permit 1019279 between March 1, 2006, and March 31, 2009.  (Compare Pls.' Mot. Summ. J., Ex. 7 with Pls.' Mot. Summ. J., Ex. 4.  See also First Am. Compl., App. B).  Many of these are alleged aluminum violations that depend on whether the aluminum effluent limitations took effect on March 12, 2008, or were extended by the WVDEP's modification order. (Id.).

C. WV/NPDES Permit Number WV1019287

On November 23, 2004, WVDEP renewed Powellton's WV/NPDES Permit Number WV1019287.  (Pls.' Mot. Summ. J., Ex. 8 at 1).  WV/NPDES Permit WV1019287 regulates water pollution discharged from Powellton's Sugarcamp Loadout and Rich Creek

---

[11] Permit WV1019449's modification order included Outfalls 002, 003, 009, 010, 011, 012, 016, 017, 018, 019, 020, 024, 025, 026, 029, 031, 032, 035, and 036.  (Pls.' Mot. Summ. J. Ex. 6 at 2).  The order omitted Outfalls 001, 005, 014, 015, 021, 022, 023, and 034 under the permit.  (Id.).

Haulroad, for which facilities Powellton holds Surface Mining Permits O300500 and O300700 respectively. (Id. at 1-2). This permit limits the concentrations of suspended solids and aluminum in Powellton's "treated drainage from the loadout and storm-water runoff from the haulroad into Rich Creek of Gauley River of the Kanawha River." (Id. at 2).

The effluent limitations on suspended solids has been in effect since at least the effective date of DEP's renewal of the permit, being November 23, 2004. (Id. at 4). Like the other two permits at issue in this case, WVDEP incorporated a three-year schedule of "report only" compliance when it renewed WV/NPDES Permit WV1019287. (Id. at 3-4). Consequently, the aluminum effluent limitations for the Sugarcamp Loadout and Rich Creek Haulroad became effective on November 24, 2007. (Id.) Unlike the other two permits at issue in this case, WVDEP did not issue a modification order for WV/NPDES Permit 1019287; so, the November 24, 2007 compliance date was not extended. (Pls.' Mot. Summ. J. at 6). Plaintiffs allege at least 447 days of violations of the effluent limitations in WV/NPDES Permit WV1019287 between July 1, 2007, and March 31, 2009. (Compare Pls.' Mot. Summ. J., Ex. 9 with Pls.' Mot. Summ. J., Ex. 8. See also First Am. Compl., App. C). Of these alleged violations,

17

only 31 occurred prior to November 2007, all 31 being in July

2007.  (Id.)


D.  Background of Plaintiffs' Civil Suit


        Seeking to comply with the notice requirements of the

Clean Water Act and SMCRA, on August 27, 2008, plaintiffs sent a

notice of intent letter ("NOI") to the manager of Powellton,

Garry Patterson; the Secretary of the WVDEP, Randy Huffman; the

Regional Administrator of the EPA for Region III, Donald Walsh;

the Administrator of the EPA, Stephen L. Johnson; the Secretary

of the U.S. Department of the Interior, Dirk Kempthorne; the

federal Director of the Office of Surface Mining Reclamation and

Enforcement, Brent Wahlquist; Powellton's registered agent, CT

Corporation System; and the federal Regional Director for the

Appalachian Region of the Office of Surface Mining Enforcement

and Reclamation.  (First Am. Compl. ¶¶ 57, 59; 8/27/08 NOI,

Partial Mot. to Dismiss, Ex. 1).  The NOI informed Powellton that

"its discharges of suspended solids, iron, manganese, and

aluminum and violations of the effluent limitations" in the three

WV/NPDES permits at issue "violate the Clean Water Act and

SMCRA."  (Id. ¶ 57).  Powellton was further informed of

plaintiffs' intent to sue for these violations at the end of the

18

sixty-day statutory notice period.  (Id. ¶ 58); see 33 U.S.C. §
1365(b)(1)(A); 30 U.S.C. § 1270(b)(1)(A).

        Apparently unbeknownst to the plaintiffs, thirteen
months before the NOI was sent to Powellton and the other
recipients, Powellton and other related entities began
discussions with the WVDEP "with respect to WV/NPDES permit non-
compliance issues."  (7/20/07 Bradley Letter, Partial Mot. to
Dismiss, Ex. 8).  A letter sent by attorney M. Ann Bradley to the
WVDEP on July 20, 2007, states that Powellton and the other
entities "would be willing to cooperate with the Department of
Environmental Protection in the resolution of these issues."
(Id.).  In response, the WVDEP sent Powellton three letters,
dated July 24, August 16, and August 29 of 2007, respectively,
concerning WV/NPDES permit numbers WV1019449, WV1019279 and
WV1019287 -- the same permits referenced in plaintiffs' NOI and
at issue in this action.  (7/24/07, 8/16/07, 8/29/07 WVDEP
Letters, Partial Mot. to Dismiss, Exs. 9, 10).  All three letters
sought information regarding discharges under the permits from
July 1, 2006, through June 30, 2007, including information on
every violation of the effluent limitations contained in the
permits, the locations of the permitted outfalls, the quality of
the receiving streams, and other information regarding compliance

19

with the permits.  (Id.).  The opening paragraph of each of the

letters states:

> Pursuant to your client's request to resolve
> outstanding Discharge Monitoring Report violations, the
> West Virginia Department of Environmental Protection
> (WVDEP) is currently pursuing an enforcement action
> involving Powellton Coal Company, LLC regarding its
> WV/NPDES permit violations.  This action is being taken
> under the provisions of the Water Pollution Control Act
> (WV Code Chapter 22, Article 11).  As part of this
> action, WVDEP requests that your client provide
> information pursuant to WV Code Chapter 22, Article 11,
> Section 4 for permit . . . [numbers WV1019279,
> WV1019449, WV1019287].

(Id.).  By letters dated August 14, and September 14, 2007,

Powellton responded to the WVDEP's requests for information.

(8/14/07 and 9/14/07 Bradley Letters, Partial Mot. to Dismiss,

Ex. 11).

Expanding the scope of its review, on January 17, 2008,

the WVDEP sent another letter to Powellton requesting the same

kinds of information it had sought in its earlier letters, but

for the period of July 1, 2007, though December 31, 2007.

(1/17/08 WVDEP Letter, Partial Mot. to Dismiss, Ex. 12).  The

opening paragraph of the letter states:

> In furtherance of the West Virginia Department of
> Environmental Protection's (WVDEP) ongoing enforcement
> action involving Powellton Coal Company, LLC regarding
> its WV/NPDES permit violations, additional information
> is requested for permit number(s) WV1019279, WV1019287,
> and WV109449.  This information is in addition to that
> previously submitted by Powellton Coal Company, LLC and

20

is requested pursuant to WV Code Chapter 232, Article
11, Section 4.

(Id.).  Powellton forwarded the requested information to the
WVDEP by letter dated February 27, 2008.  (2/27/08 Bradley
Letter, Partial Mot. to Dismiss, Ex. 13).

On August 29, 2008, two days after plaintiffs sent the
NOI, the WVDEP issued a draft "Consent Order" number M-08-021 to
Powellton.  (Draft Order, Partial Mot. to Dismiss, Ex. 2).  Four
days later, on September 2, 2008, Garry Patterson signed the
draft order on Powellton's behalf.  (Id.).  On October 17, 2008,
at the conclusion of the public notice and comment period
mandated by W. Va. Code R. §§ 47-1-1 through 7, the WVDEP sent
Powellton a letter stating that only one comment had been
received, that the comment did not relate to the content of the
order, and that no changes had been made to the draft order.
(10/17/08 WVDEP Letter, Partial Mot. to Dismiss, Ex. 4).
Enclosed with the letter was a fully executed copy of consent
order number M-08-021, which became effective on October 16,
2008.  (Id.; Consent Order, Partial Mot. to Dismiss, Ex. 4).

The consent order requires Powellton to "immediately
take all measures to initiate compliance with all terms and
conditions" of WV/NPDES permit numbers WV1019449, WV1019279 and

21

WV1019287.  (Consent Order, Partial Mot. to Dismiss, Ex. 4 at 5).

Within ninety days of its entry, the order requires Powellton to

submit a "Corrective Action Plan" outlining how and when

Powellton will achieve compliance with those permit limits for

which compliance cannot immediately be achieved.  (Id.).  The

order also requires Powellton to submit a "Reporting Plan"

addressing certain issues "relating to reporting requirements

under the Permits . . . ."  (Id. at 6).  Based on its

investigation of Powellton, the WVDEP documented violations of

the permitted effluent limits within Powellton's permits

occurring throughout 2007.  (Id. at 4).  These violations are

detailed in the "Summary of Permitted Effluent Limit Violations"

attached to the consent order, which the order summarizes as:

> a.  21 (twenty one) minor violations of average monthly
>     permit limits or maximum daily permit limits.
> b.  26 (twenty six) moderate violations of average monthly
>     permit limits or maximum daily permit limits.
> c.  3 (three) major violations of average monthly permit
>     limits or maximum daily permit limits.

(Id.).

"Because of Powellton's WV/NPDES permit violations,"

Powellton agreed, through the consent order, to the assessment of

a $121,110 administrative penalty.  (Id. at 5).  The order also

establishes four categories of stipulated penalties, the first

three of which commence on the effective date of the order,

22

October 16, 2008: (a) $10,000 for each month through March 2009 Powellton fails to submit a DMR for one or more outlets with permit limits; (b) $1,000 through $3,000 "per day per violation" for failure to comply with the terms of the consent order effective until termination of the order; (c) $1,000 through $5,000 per violation of "permit limits at the outlets and for parameters" addressed in the Corrective Action Plan, with no final date; and (d) $1,000 through $3,000 for "exceedences of effluent limitations specified in the Permits" for the period from January 1, 2008 through the effective date of the order, October 16, 2008.  (Id. at 5-6).

On October 24, 2008, eight days after the consent order became effective, Powellton sent the plaintiffs a letter in response to the NOI.  (10/24/08 Response to NOI, Partial Mot. to Dismiss, Ex. 5).  The letter states that the violations alleged in the NOI "are the subject of a comprehensive enforcement action by the WVDEP," and thus, plaintiffs' claims under the Clean Water Act are precluded.  (Id. at 1-3).  The letter provides further that the relief sought by plaintiffs' threatened SMCRA claims "has already been provided by the WVDEP through the issuance of the Consent Order," and that bringing suit under SMCRA "would be unfounded and an irresponsible waste of judicial resources."

(Id. at 4).  Nevertheless, on November 24, 2008, eighty-nine days after sending the NOI, plaintiffs instituted this action.

On November 25, 2008, a day after filing suit, plaintiffs sent a second NOI to Powellton and the same individuals and entities to which the first NOI had been sent. (First Am. Compl. ¶ 61, 63).  This second NOI notified Powellton of alleged Clean Water Act and SMCRA violations resulting from unlawful discharges of suspended solids, iron and aluminum under WV/NPDES permit numbers WV1019449 and WV1019279 during the third quarter of 2008 at outfalls not identified in the first NOI. (Id. ¶ 61).  The second NOI also notified Powellton of plaintiffs' intent to sue for these violations at the end of the sixty-day notice period.  (Id. ¶ 62).  On February 13, 2009, plaintiffs sent Powellton, the EPA, the WVDEP, and others a third and final NOI notifying Powellton of plaintiffs' intent to amend the complaint to include claims for violations of parameters included in the first NOI of August 27, 2008, but omitted from the original complaint; violations of parameters included in the second NOI of November 25, 2008; and violations of parameters revealed by Powellton's fourth quarter 2008 DMRs that were not identified in either the first or second NOI.

Ninety-one days after sending the third NOI, on May 15, 2009, plaintiffs filed a six-count first amended complaint for declaratory and injunctive relief and for civil penalties.  The first amended complaint contains an additional 3,087 alleged violations occurring after the filing of the original complaint in November 2008 through March 2009.  (First Am. Compl., Exs. A, B, and C). The first amended complaint sets forth the following claims: Count 1, Clean Water Act Violations of WV/NPDES Permit Number WV1019449; Count 2, SMCRA Violations Related to WV/NPDES Permit Number WV1019449; Count 3, Clean Water Act Violations of WV/NPDES Permit Numer WV1019279; Count 4, SMCRA Violations Related to WV/NPDES Permit Number WV1019279; Count 5, Clean Water Act Violations of WV/NPDES Permit Numer WV1019287; Count 6, SMCRA Violations Related to WV/NPDES Permit Numer WV1019287. Plaintiffs seek an order declaring that Powellton has violated and continues to violate the Clean Water Act and SMCRA; enjoining Powellton from operating its facilities in a manner that will result in further violations of the effluent limitations in WV/NPDES permit numbers WV0109449, WV1019279 and WV1019287; ordering Powellton to immediately comply with all effluent limitations, monitoring and reporting requirements and other terms and conditions of the three WV/NPDES permits; ordering Powellton to immediately comply with the terms and conditions of

WVSCMRA permit numbers S300301, S300400, O300500 and O300700;
ordering Powellton to pay civil penalties up to $27,500 per day
for each violation of the Clean Water Act occurring prior to
March 15, 2004, and $32,500 per day for each violation occurring
after that date; ordering Powellton to conduct monitoring and
sampling to determine the environmental effects of its
violations, to remedy and repair environmental contamination
and/or degradation caused by its violations, and restore the
environment to its prior uncontaminated condition; awarding
plaintiffs' attorney and expert witness fees and all other
reasonable expenses incurred in pursuing this action; and
granting other such relief as the court deems just and proper.
(First Am. Compl at 21-22).

         On May 29, 2009, Powellton filed a partial motion to
dismiss those violations in plaintiffs' compliant that had
already been addressed in the order issued by the WVDEP.
Powellton contended that plaintiffs' claims were precluded by the
Clean Water Act because the WVDEP had "commenced and is
diligently prosecuting" an administrative penalty action under
state law "comparable" to section 309(g) of the Clean Water Act.
Sierra Club v. Powellton Coal Co., No. Civ.A. 2:08-1363, 2009 WL
2524746 (S.D. W. Va. Aug. 18, 2009).  On August 18, 2009, the

court held in this action that plaintiffs' claims were not
precluded by Clean Water Act section 309(g)(6)(A)(ii) because
West Virginia law is not comparable to section 309(g) of the
Clean Water Act.[12]  Id. at *15.

                            III.


        Powellton provides four arguments for granting summary
judgment in its favor.  First, Powellton asserts that even if
plaintiffs' citizen suit is not precluded by the statutory bar in
§ 309(g)(6)(A)(ii) of the Clean Water Act,[13] plaintiffs cannot
collaterally attack the civil penalties imposed by the Consent
Order.  Second, Powellton contends that plaintiffs have used this
citizen suit to usurp the WVDEP's role as the primary enforcer of
the Clean Water Act as to the violations occurring after the

_____

        [12]Additionally, the court held that plaintiffs' SMCRA claims
do not attempt to alter, supercede, amend, modify, or repeal the
Clean Water Act in a manner that required dismissal of their
claims.  Sierra Club v. Powellton Coal Co., No. Civ.A. 2:08-1363,
2009 WL 2524746 at *19 (S.D. W. Va. Aug. 18, 2009).

        [13] Powellton's motion included an argument that plaintiffs'
citizen suit was precluded by a statutory bar within the Clean
Water Act itself.  The court resolved that issue when, in its
denial of Powellton's motion to dismiss, it held that plaintiffs'
citizen suit was not precluded by § 309(g)(6)(A)(ii) of the Clean
Water Act.  Sierra Club v. Powellton Coal Co., No. Civ.A. 2:08-
1363, 2009 WL 2524746 (S.D. W. Va. Aug. 18, 2009).

                            27

effective date of the Consent Order.  Third, Powellton claims
that the aluminum violations alleged by plaintiffs for the
outfalls governed by Permit WV1019279 and WV1019449 are
unsupported by the record because the aluminum compliance
deadlines were extended by various modification orders issued by
the WVDEP.  Lastly, Powellton asserts that plaintiffs cannot
establish that a continuing violation exists as to each of the
violations alleged in the complaint.

Plaintiffs Sierra Club and Ansted Historic Preservation
Council, Inc. contend that they are entitled to partial summary
judgment on the issue of Powellton's liability for the Clean
Water Act claims in plaintiffs' first, third, and fifth claims
for relief and declaratory judgment that Powellton has violated
the Clean Water Act in each of the instances identified in
plaintiffs' motion.  Plaintiffs seek full summary judgment for
their SMCRA claims in their second, fourth, and sixth claims for
relief.  They claim that Powellton is in continuing violation of
the Clean Water Act and SMCRA and that Powellton is liable for
thousands of violations of the Clean Water Act and SMCRA through
March 31, 2009.  Plaintiffs seek partial summary judgment on
Powellton's liability for the Clean Water Act claims and
declaratory judgment that Powellton has violated the Clean Water

Act in each of the instances detailed by plaintiffs. Plaintiffs seek summary judgment on their SMCRA claims and a declaratory judgment that Powellton has violated SMCRA in each of the instances detailed by plaintiffs. Additionally, plaintiffs seek permanent injunctive relief to protect against irreparable harm caused by Powellton's alleged violations.[14]

A.  Defendant's Argument that Plaintiffs' Claims are Precluded as a Collateral Attack on the Civil Penalties Imposed by the Consent Order

When Congress enacted the Clean Water Act, it deliberately enabled the EPA, the states, and private citizens to play a role in enforcement to better accomplish its goal of protecting the nation's waters. The Supreme Court in <u>Gwaltney I</u> described the intended balance between government enforcement and citizen suits when it stated that a "citizen suit is meant to supplement rather than to supplant governmental action." 484 U.S. at 60. Despite being supplementary in nature, the "citizen-

---

[14] Plaintiffs elaborate extensively in their memorandum as to how they have satisfied the requirements for standing and properly complied with the 60-day notice provisions for the NOIs. Powellton makes no argument or reference to standing or improper NOI procedure in its response. Having reviewed the plaintiffs' memorandum and exhibits attached to the motion, the standing requirements and statutorily required NOI procedures are satisfied.

suit provision is a critical component of the Clean Water Act's enforcement scheme, as it 'permit[s] citizens to abate pollution when the government cannot or will not command compliance.'" Envtl. Conservation Org. v. City of Dallas, 529 F.3d 519, 526 (5th Cir. 2008) (quoting Gwaltney I, 484 U.S. at 62). Recognizing that "[p]ermitting citizen suits for wholly past violations of the [Clean Water] Act could undermine the supplementary role envisioned for the citizen suit," the Supreme Court held that citizen plaintiffs must allege "a state of either "continuous or intermittent violation -- that is, a reasonable likelihood that a past polluter will continue to pollute in the future" -- in order to maintain a citizen suit under the Clean Water Act. Gwaltney I, 484 U.S. at 60, 57.  In this instance, plaintiffs do not rely exclusively on "wholly past" violations, but specifically allege that Powellton is engaged in the type of continuing or intermittent violations that authorize them to maintain a citizen suit under the Clean Water Act and Gwaltney I.

To avoid duplicative actions against alleged polluters, Congress included the statutory bar found in section 309(g)(6)(A) of the Clean Water Act to preclude citizen suits when certain actions have been undertaken by the EPA or the states.  Section 309(g)(6)(A) provides an express statutory bar on citizen suits

for violations with respect to which the EPA or a state "has commenced and is diligently prosecuting" an administrative penalty action.  This court held in its denial of Powellton's motion to dismiss that the Clean Water Act does not bar the plaintiffs' citizen suit in this instance because administrative penalty actions under West Virginia law are not "comparable" to those under section 309(g).  Specifically, West Virginia's scheme lacks comparability because, unlike section 309(g), it does not provide for the assessment of administrative penalties without the violator's consent.  <u>Sierra Club v. Powellton Coal Co.</u>, No. Civ.A. 2:08-1363, 2009 WL 2524746 at *15 (S.D. W. Va. Aug. 18, 2009).

Inasmuch as the plaintiffs' claims have survived the statutory preclusion analysis under section 309(g)(6)(A), the court addresses Powellton's alternative theory that, even if not statutorily barred by the Clean Water Act, the plaintiffs' suit should be found precluded as an impermissible collateral attack on the terms of the WVDEP's Consent Order.

As support for its "collateral attack" theory, Powellton relies on the court of appeals' decision in <u>Comfort Lake Ass'n, Inc. v. Dresel Contracting, Inc.</u> 138 F.3d 351 (8th Cir. 1998).  In <u>Comfort Lake</u>, the Eighth Circuit prohibited a

citizen plaintiff's collateral attack upon the penalties imposed
by the state agency's "stipulation agreement" with the polluter
"for the very same violations alleged in the citizen suit."  Id.
at 356.  The Eighth Circuit recognized that the stipulation
agreement in Comfort Lake did not bar citizen suit through the
doctrines of res judicata or collateral estoppel as would a
judicially approved consent decree.  Id. at 357.  Nonetheless,
the court accorded the agreement "considerable deference" as a
final agency enforcement action in finding that its terms
precluded citizen suit for the very same violations where "the
agreement is the result of a diligently prosecuted enforcement
process, however informal."  Id.

         Whereas Powellton emphasizes the Eighth Circuit's
decision in Comfort Lake as justification for precluding
plaintiffs' suit in this instance, the facts in this case and
those in Comfort Lake differ significantly.  Unlike the situation
in Comfort Lake, the violations encompassed within the WVDEP's
consent order are not entirely coextensive with the violations
alleged in plaintiffs' amended complaint.  Plaintiffs allege a
substantial number of violations occurring after the October 2008
effective date of the WVDEP Consent Order.  From November 2008
through March 2009, plaintiffs specifically allege 1,264

violations for WVDEP Permit No. WV1019449, 1,376 violations for
WVDEP Permit No WV1019279, and 447 violations for WVDEP Permit
No. WV1019287. (First Am. Compl. Exs. 1-3).  These alleged
violations continued for months after the effective date of the
consent order, whereas the violations in Comfort Lake occurred
prior to the agreement imposing penalties and were highly
unlikely to continue inasmuch as they were caused by construction
which had concluded at the time of the penalty settlement.
Comfort Lake, 138 F.3d at 357.

        In contrast to Comfort Lake, the allegations here -
over 3,000 violations within five months after the consent
decree - reflect more than a "realistic prospect" that the
violations will continue notwithstanding the penalties imposed by
the WVDEP.  In a similar situation, the United States Court of
Appeals for the Second Circuit considered whether a properly
commenced citizen suit "may continue in the face of a dispositive
administrative and criminal settlement."  Atlantic States Legal
Foundation, Inc. v. Eastman Kodak Co., 933 F.2d 124, 127 (2d
Cir. 1991).  In Eastman Kodak, the state had reached a civil and
criminal compromise with Eastman Kodak following the filing of
plaintiff's citizen suit and request for further penalties.  Id.
The Second Circuit ruled that a citizen plaintiff may "not

33

challenge the terms of a settlement between [the defendant and the state agency] <u>unless</u> there is a realistic prospect that the violations alleged in [the plaintiff's] complaint will continue notwithstanding settlement." <u>Id.</u> (emphasis added).  In order to be consistent with the language of both the Clean Water Act and <u>Gwaltney</u>, "[a] citizen suing pursuant to Section 505 of the Act thus may not revisit the terms of a settlement without regard to the probability of a continuation of the violations alleged in its complaint." <u>Id.</u>  The standard established in <u>Eastman Kodak</u> strikes an equitable balance, affording deference to the negotiated penalty arrangement between the violator and the state agency while permitting citizen suits to continue where the language of the Clean Water Act allows.

Three district court decisions from New Jersey, decided by different district judges, reached the same conclusion and allowed citizen claims for civil penalties to continue despite the overlap with penalties imposed by the state agency.  In <u>Public Interest Research Group of N.J., Inc. v. Yates Indus., Inc.</u>, the defendant asserted at summary judgment that 177 of the violations alleged by plaintiffs should be dismissed "because they duplicate violations raised in an administrative action initiated by the [New Jersey] DEP."  757 F. Supp. 438, 444

(D.N.J. 1991).  The posture of the <u>Yates</u> case was noteworthy.
The New Jersey District Court had previously denied defendant's
motion to dismiss, concluding that the citizen suit was not
preempted by § 309(g)(6).  <u>Id.</u>  At summary judgment, defendant
suggested that plaintiffs' allegations should nevertheless be
dismissed as a matter of equity.  <u>Id.</u>  In line with the rationale
of <u>Eastman Kodak</u>, rather than finding plaintiffs' claims
precluded as overlapping those matters addressed by the New
Jersey DEP, the court in <u>Yates</u> concluded that "Congress was
presumably aware of the risks and inefficiencies of parallel
actions when it drafted [§ 309(g)(6)(B)] and determined that some
duplication is acceptable."  <u>Id.</u> at 444-45.  Therefore, courts
"cannot circumvent the legislative plan by dismissing individual
allegations" when the Clean Water Act does not bar citizen suits.
<u>Id.</u> at 445.  It was further noted that deference to the state
agency's imposition of penalties did not abate plaintiffs'
claims; rather, the court retained the ability, depending upon
the judgment ultimately entered in the citizen suit, to "adjust[]
any relief which may be granted to plaintiffs to reflect DEP
actions."  <u>Id.</u>  Accordingly, the duplicative violations raised by
plaintiffs survived summary judgment.  <u>Id.</u> at 445.

Despite the decision in <u>Yates</u>, the defendant in <u>Public Interest Research Group of New Jersey, Inc. v. Hercules, Inc.</u> contended that plaintiffs could not "obtain penalties for the same permit violations for which [the defendant] has already paid penalties" as a matter of equity.  830 F. Supp. 1525, 1538 (D.N.J. 1993), <u>reversed on other grounds</u>, 50 F.3d 1239 (3d Cir. 1995).  Upon finding that section 309(g)(6) did not bar plaintiffs' suit, the court permitted plaintiffs to seek "imposition of additional penalties beyond those already assessed against [defendant] by the [New Jersey DEP]" for the same violations covered by the consent order.  <u>Id.</u> at 1539.

In the third New Jersey District Court case, with facts similar to those herein, the court considered citizen plaintiffs' claims of violations previously addressed by the New Jersey DEP.  <u>Public Interest Research Group of N.J., Inc. v. GAF Corp.</u>, 770 F. Supp. 943 (D.N.J. 1991).  The decision in <u>GAF</u> involved a negotiated administrative consent order entered into by the New Jersey DEP and the defendant.  <u>Id.</u> at 945.  The consent order included most of the violations alleged by plaintiffs.  In addition, however, plaintiffs alleged 52 other violations not covered by the consent order.  <u>Id.</u> at 948.  The New Jersey DEP imposed penalties in the amount of $227,000, but chose to "forego

36

[seeking the] maximum penalties 'in light of the cooperation of GAF' and the schedule for upgrading GAF's waste water treatment plant." <u>Id.</u> at 948. The court in <u>GAF</u> concluded that the New Jersey DEP's actions against GAF was not "comparable" within the meaning of section 309 of the Clean Water Act and thus allowed the citizen suit to proceed. <u>Id.</u> at 951; <u>see also</u> <u>McAbee v. City of Fort Payne</u>, 318 F.3d 1248, 1257 (11th Cir. 2003)("Because the public-participation provisions of Alabama law are not sufficiently comparable to the CWA's public-participation provisions, we hold that sections 1319(g)(6)(A)(ii) and 1319(g)(6)(A)(iii) do not preclude McAbee's citizen suit.").

The competing public/private enforcement scenario in this action is analogous in many respects to the circumstances in <u>Eastman Kodak</u>, <u>Yates</u>, <u>Hercules</u>, and <u>GAF</u>. In those four actions as in this one, the citizen plaintiffs alleged violations beyond those covered by the agreement between the state agency and the violator. The decision in <u>Comfort Lake</u>, however, is quite distinct. That citizen suit sought penalties beyond those already imposed by the state agency but only for the "very same violations." Furthermore, the text of section 309(g)(6)(A) simply does not flatly bar a citizen suit from proceeding. Indeed, that section of the Clean Water Act "explicitly allows

certain parallel proceedings, which will inevitably involve some identical allegations." <u>Yates</u>, 757 F. Supp. at 444.  So long as the Clean Water Act does not explicitly bar plaintiffs' claims and, given Congress' apparent desire to foster both private and public enforcement, the court declines to preclude plaintiffs' claims merely out of deference to a consent order that it has found lacks comparability under the Clean Water Act.

This is not to mean, however, that the court will not give due regard to the actions previously taken by the WVDEP. The relief, if any, ultimately awarded plaintiff must account in an appropriate way for "the significant experience and expertise of the [WVDEP] in the area . . . [inasmuch as] this court has no interest in duplicating the efforts of a specialized body such as the [WVDEP]." <u>Hercules</u>, 970 F.Supp. at 365.

In the event that a court need consider whether to impose additional civil penalties, section 309(d) of the Clean Water Act provides six statutory factors for courts to consider when assessing civil penalties:

> the seriousness of the violation or violations,
> the economic benefit (if any) resulting from the violation,
> any history of such violations,
> any good-faith efforts to comply with the applicable
>     requirements,
> the economic impact of the penalty on the violator, and
> such other matters as justice may require.

The court is vested with substantial discretion in balancing these statutory considerations.  Weinberger v. Romero-Barcelo, 456 U.S. 305 (1982); see also Hercules, 970 F. Supp. at 365.  In accordance with the court's reluctance to duplicate the specialized actions of the DEP, Judge Simandle in Hercules formulated still further factors to be considered along with the six statutory factors set forth in the Clean Water Act.  These additional considerations to be utilized in ascertaining the weight to be afforded the state agency's prior actions include whether:

> (1) there was a meaningful degree of citizen participation; (2) there is evidence of a careful, individualized determination based on all the relevant facts; and (3) the process resulted in an effective remedy for society sufficient to abate and deter pollution."

Id. at 365.  These factors serve to both "guide and limit the Court's inquiry into the [WVDEP]'s process" so that the court does not embark upon a "reconstruction of the . . . process."  Id. at 365, 366.

In sum, Powellton's suggestion that plaintiff's claims should be found precluded at the outset based on deference to the WVDEP's prior actions is not persuasive.  As plaintiffs noted, "Congress expressly defined the circumstances in which a state enforcement action is to be given preclusive effect" and this is

not one of those instances.  While the WVDEP's decision warrants deference, deference does not become a bar.  Plaintiffs allege a substantial number of violations occurring after the consent order, and plaintiffs are not barred from seeking additional penalties for violations within the consent order or those occurring afterwards.  But, as in Hercules, the court today is not "deciding whether . . . [it] will in fact impose additional penalties for those violations already addressed by the [WVDEP] in the [consent order].  The court reserves that decision until trial."  Hercules, 830 F. Supp. at 1540.  Accordingly, Powellton's motion for summary judgment based on preclusion of plaintiffs' suit is denied.

B. Defendant's Argument that Plaintiffs' Civil Suit Usurps
   WVDEP's Role as the Primary Enforcer of the Clean Water Act

        Powellton suggests that plaintiffs' claims "usurp" WVDEP's role as the primary enforcer of the Clean Water Act for the claims occurring after the consent order.  As discussed above, citizen suits under the Clean Water Act were intended "to supplement rather than to supplant governmental action."  Gwaltney I, 484 U.S. at 60.  However, Congress recognized the "important role citizens can play in abating pollution of United

40

States waters" and vested them with limited power to participate in enforcement of the Clean Water Act.  <u>Comm. for Consideration of Jones Falls Sewage Sys. v. Train</u>, 539 F.2d 1006, 1015 (4th Cir. 1976).  As an initial matter, the Clean Water Act prohibits citizens from filing suit prior to sixty days after giving notice to the EPA, the state, and the alleged violator.  33 U.S.C. § 1365(b)(1)(A).  Furthermore, citizens may not file suit if the EPA or state has "commenced and is diligently prosecuting" an action against the alleged violator.  <u>Id.</u> at § 1365(b)(1)(B).  Apart from these two provisions, citizen suits are permissible under the Clean Water Act.

Powellton argues that plaintiffs' have usurped WVDEP's authority and deprived the WVDEP of a reasonable opportunity to enforce the Clean Water Act.  Powellton suggests that plaintiffs' amendment of their complaint to include violations not covered by the consent order was "taken immediately, and sooner than the WVDEP's current enforcement system would normally allow for DMR review and the initiation of enforcement action, thereby denying WVDEP of a reasonable period of time to review and assess Powellton's DMR data."  (Def.'s Mot. Summ. J. at 10-11).

Powellton's argument protests the speed of plaintiffs' action, but does not suggest that plaintiffs have violated the

41

60-day notice requirement under the Clean Water Act or SMCRA.

The 60-day notice requirement accomplishes two specific

objectives:

> First, notice allows Government agencies to take
> responsibility for enforcing environmental regulations,
> thus obviating the need for citizen suits.  In many
> cases, an agency may be able to compel compliance
> through administrative action, thus eliminating the
> need for any access to the courts.  Second, notice
> gives the alleged violator 'an opportunity to bring
> itself into complete compliance with the Act and thus
> likewise render unnecessary a citizen suit.'

Hallstrom v. Tillamook County, 493 U.S. 20, 29 (1989) (quoting

Gwaltney I, 484 U.S. at 60) (citations omitted).  If the agency

is unable to compel compliance and the alleged violator continues

to violate the Clean Water Act following the 60-day period,

citizens are empowered to enforce the terms of the Clean Water

Act through citizen suit.  Congress specified the time frame for

bringing a citizen suit under the Clean Water Act and SMCRA, and

the plaintiffs complied with it.  Powellton's motion for summary

judgment based on plaintiffs' alleged usurpation of the WVDEP's

authority is denied.

**C. Defendant's Argument that Plaintiffs Cannot Establish Aluminum Violations under WV/NPDES Permit Nos. WV1019279 and 1019449 Because of Modification Orders Issued by the WVDEP**

Powellton contends that modification orders issued by the WVDEP extended the compliance date for aluminum effluent to the reissuance of Permits WV1019279 and WV1019449.  As the reissuance of these permits remains pending before the WVDEP currently, Powellton contends that it could not have incurred aluminum violations as there was never an aluminum effluent limitation in effect.

Federal and state regulations provide the proper procedures for issuing permit modifications.  There are two types of permit modification: minor and major.  40 C.F.R. §§ 122.62, 122.63; W. Va. Code R. § 47-30-8.2.  Minor modifications do not require public notice for certain small changes to permits, such as correcting typographical errors. 40 C.F.R. § 122.63; W. Va. Code R. § 47-30-8.2.c.1.  None of the modifications issued by the WVDEP for WV/NPDES Permits WV1019279 and WV1019449 fall within the enumerated list of permissible minor modifications, so they must be considered major.

Federal and state law specifically categorize as major modifications those that are based on new rules and those that

43

change compliance schedules. 40 C.F.R. § 122.62; W.Va. Code R. § 47-30-8.2.c.2.C-D. Major modifications require preparation of a draft permit and compliance with public notice procedures. 40 C.F.R. § 122.62; W. Va. Code R. § 47-30-8.2.c.2. In order to be valid, there must be notice advising the public that a draft permit has been prepared and providing a minimum 30 day period for public comment. Id. If the modification orders do not comply with the requisite procedures, they are defective and citizen suits may proceed based on the terms of an original permit. Ohio Valley Envtl. Coal., Inc. v. Apogee Coal Co., LLC, 531 F. Supp. 2d 747, 754 (S.D. W. Va. 2008). See also Proffitt v. Rohm & Haas, 850 F.2d 1007 (3d Cir. 1988); Citizens for a Better Env't-CA v. Union Oil Co. of CA, 83 F.3d 1111 (9th Cir. 1996).

1. Modification Orders for WV/NPDES Permits WV1019279 and WV1019449 Following the EPA's Issuance of Revised Aluminum Water Quality Standards

Powellton relies on two modification orders for Permits WV1019279 and WV1019449 issued on March 27, 2006, to avoid liability for the alleged aluminum violations under those permits. The modification orders were issued following the EPA's approval of new dissolved aluminum criteria for all waters except

44

trout streams.  (Modification Order, Def.'s Mot. Summ. J., Ex. 1).  Powellton claims that the modification orders extended the "Report Only" compliance schedule for aluminum beyond the three years initially set by the permits and through the reissuance of the permits, which are in the process of being reissued by the WVDEP currently.  Accordingly, Powellton argues that the outlets covered by these two permits are not, and have not, been subject to aluminum effluent limitations at any time during the period covered by plaintiffs' citizen suit.

Plaintiffs suggest that Powellton's reliance on these modification orders is misplaced.  Plaintiffs allude to the lack of evidence that the modification orders were issued in accordance with the statutory requirements for major permit modifications.  Indeed, Powellton has provided no evidence that the modification orders were validly issued.  Powellton failed to produce evidence that the WVDEP issued draft permits or complied with the public notice requirements.  Powellton argues that the two modification orders issued by the WVDEP in response to revised aluminum water quality standards "merely reduced the burden on both the agency and the regulated community of adapting" rather than requiring the many companies affected by the change to apply for permit modifications.  (Def.'s Resp. to

45

Pls.' Mot. Summ. J. at 14).  While that procedure may arguably be the more practical method of modifying such a high number of permits, the statutory requirements for major permit modifications still apply.  Without any evidence that the WVDEP issued draft permits and provided the requisite 30-day comment period, Powellton's motion for summary judgment regarding liability for the aluminum violations subject to the two modification orders for WV/NPDES Permits WV1019279 and WV1019449 is denied and plaintiffs may establish continuing aluminum violations in accordance with the aluminum compliance schedules within the original permits.[15]

### 2. Modification No. 2 for WV/NPDES Permit WV1019449

Alternatively, Powellton argues that even if the two modification orders discussed above were invalid, Modification No. 2 extended the deadline for aluminum compliance for Permit WV1019449.  Modification No. 2 was issued in response to Powellton's application for a modification of the manganese

---

[15] As noted above, the modification order for WV1019279 omitted several outfalls from its coverage.  Because the court concludes that the modification orders were ineffective, there is no need to address whether the outfalls were omitted by WVDEP error as suggested by Powellton.

limits. (Def.'s Mot. Summ. J., Ex. 2 at 2). Powellton argues that Modification No. 2 extended the deadline for aluminum compliance in addition to making the manganese modification. The court is not persuaded by Powellton's characterization of Modification No. 2.

By its own terms, Modification No. 2 changes manganese limits for outfalls covered by Permit WV1019449 and notifies the permittee "that all other terms and conditions of the permit shall remain in full force and effect." (Def.'s Mot. Summ. J., Ex. 2 at 2). Nevertheless, Powellton suggests that Modification No. 2 set a September 23, 2008 deadline for aluminum compliance. In actuality, it appears more likely that the WVDEP intended Modification No. 2 to reflect the change already made by the modification order issued March 27, 2006. Modification No. 2 lists the "Report Only" requirement for aluminum as ending on the date of the permit's expiration, which is in accordance with the earlier modification order that "extended any final aluminum effluent limitations for those outlets until the expiration date of the affected permits." (Def.'s Mot. Summ. J. at 12). The only reference to aluminum in Modification No. 2 or in the required public notice is aluminum's listing in the Discharge Limitations and Monitoring Requirements along with the other

47

regulated substances under the permit.  (Id. at 3-21).  Most
convincingly, Modification No. 2 expressly limited its scope so
that all other terms and conditions of the permit would remain in
full force and effect.  There is no indication that the WVDEP
intended Modification No. 2 to affect the deadline for aluminum
effluent compliance.  Because Modification No. 2 merely reflected
the changes of the March 27, 2006 order, Powellton's motion for
summary judgment based on Modification No. 2's extension of the
aluminum compliance deadline is denied and plaintiffs may
establish continuing aluminum violations in accordance with the
aluminum compliance schedules within the original permits.


**D. Defendant and Plaintiffs' Arguments With Respect to
   Plaintiffs' Ability to Establish "Continuing Violations" Under
   the Clean Water Act and SMCRA**


        Both parties have moved for summary judgment regarding

Powellton's alleged continuing violations of the effluent

limitations under the Clean Water Act and SMCRA.[16]  Section 505(a)

---

[16] Plaintiffs' Clean Water Act claims seek, among other
things, injunctive relief compelling Powellton to comply with the
terms of its three WV/NPDES permit; plaintiffs SMCRA claims seek
injunctive relief compelling compliance with the terms of its
four WVSCMRA permits which incorporate the effluent limitations
contained in the three WV/NPDES permits.  In essence, the relief
sought by the plaintiffs under SMCRA is duplicative of that
sought under the Clean Water Act.  The court found this

48

of the Clean Water Act enables citizens to file civil actions against any person "who is alleged to be in violation of" Clean Water Act standards.  See also Am. Canoe Ass'n, Inc. v. Murphy Farms, Inc., 412 F.3d 536, 538 (4th Cir. 2005).  Citizen suits under the Clean Water Act are limited to cases in which "citizen-plaintiffs allege a state of either continuous or intermittent violation --that is, a reasonable likelihood that a past polluter will continue to pollute in the future."  Chesapeake Bay Found., Inc. v. Gwaltney of Smithfield, Ltd., 484 U.S. 49, 64 (1987)("Gwaltney I").  For purposes of determining ongoing violation, violations should be considered on a parameter-by-parameter basis.  Chesapeake Bay Found., Inc. v. Gwaltney of Smithfield, Ltd., 890 F.2d 690, 689 (4th Cir. 1989) ("Gwaltney III"); see also Sierra Club v. Shell Oil Co., 817 F.2d 1169, 1173 (5th Cir. 1987) ("When determining whether a permit-holder has

---

permissible in the court's order of August 18, 2009, denying the defendant Powellton's motion to dismiss.

     Accordingly, violations of the effluent limitations within the three WV/NPDES permits issued under the Clean Water Act are likewise violations of the effluent limitations of the four WVSCMRA permits issued under WMVSCMRA and SMCRA.  To the extent that plaintiff establishes Clean Water Act violations as alleged in Counts 1, 3, and 5, plaintiff also establishes an equivalent number of SMCRA violations as alleged in Counts 2, 4, and 6.

violated an effluent limitation, one must look at each parameter within each point source independently.").

In order to maintain a citizen suit under the Clean Water Act, the Supreme Court has ruled, as noted, that citizen-plaintiffs must be able to establish a "continuous or intermittent violation" outside of "wholly past violations." Gwaltney I, 484 U.S. at 64. The Fourth Circuit provided two methods to establish continuing violations, referred to as the Gwaltney II test.

> Citizen-plaintiffs may accomplish this either (1) by proving violations that continue on or after the date the complaint is filed, or (2) by adducing evidence from which a reasonable trier of fact could find a continuing likelihood of a recurrence in intermittent or sporadic violations.

Chesapeake Bay Found., Inc. v. Gwaltney of Smithfield, Ltd., 844 F.2d 170, 171-72 (4th Cir. 1988)("Gwaltney II"). Plaintiffs utilize both prongs of the test to establish Powellton's continuing violation of the Clean Water Act. (Pls.' Mot. Summ. J. at 14).

In order to prevail on a motion for summary judgment based on continuing violations of the Clean Water Act, "the defendant must prove that the plaintiff's allegations of a continuous or intermittent violation do not raise a genuine issue

of material fact." <u>Carr v. Alta Verde Indus., Inc.</u>, 931 F.2d

1055, 1061 (5th Cir. 1991) (citing <u>Gwaltney I</u>, 484 U.S. at 66).

> A plaintiff will survive summary judgment on the
> <u>Gwaltney I</u> requirement if he can show either that there
> is no genuine dispute as to material fact on the issue
> and that the plaintiff is entitled to judgment as a
> matter of law or that there is a genuine factual
> dispute and a reasonable jury could find for the
> plaintiff on the issue.

<u>Am. Canoe Ass'n v. Murphy Farms, Inc.</u>, 326 F.3d 505, 521 (4th

Cir. 2003).

### 1. Post-Complaint Violations Under the First Prong of the <u>Gwaltney II</u> Test

Plaintiffs specifically allege post-complaint

violations of 21 different parameters as continuing violations

under the first prong of the <u>Gwaltney II</u> test.[17]  Under WV/NPDES

---

[17] Plaintiffs initially alleged post-complaint violations of
18 different parameters in their motion for summary judgment.
(Pls. Mot. Summ. J. at 14).  Plaintiffs' reply brief alleged
additional post-complaint violations for 4 more parameters.
(Pls. Reply at 4 n. 4).  Plaintiffs listed the new violations as:
(1) iron at Outfall 030 of WV/NPDES Permit WV1019449,
(2) aluminum at Outfall 030 of WV/NPDES Permit WV1019449,
(3) aluminum at Outfall 001 of WV/NPDES Permit WV1019279, and
(4) aluminum at Outfall 003 of WV/NPDES Permit WV1019279. (<u>Id.</u>).

However, plaintiffs previously alleged post-complaint
violation of the aluminum parameter at Outfall 030 of WV/NPDES
WV1019449 in their motion for summary judgment.  (Pls. Mot. Summ.
J. at 14).  As it appears to be somewhat unclear in the briefs,
the clear grants the parties the opportunity to provide the court

51

Permit 1019449, plaintiffs cite post-complaint violations
consisting of total suspended solids at Outfall 027, iron at
Outfalls 027 and 030, and aluminum at Outfalls 027, 028, 029, and
030. (Pls.' Mot. Summ. J. at 14; Pls.' Mot. Summ. J., Exs. 3, 7,
& 9; Pls.' Reply at 4, 9; Pls. Reply, Ex. 1 & 3). Under WV/NPDES
Permit 1019279, plaintiffs cite post-complaint violations
consisting of manganese at Outfall 002 and aluminum at Outfalls
001, 002, 003, 014, 019, 020, 021, 022, 023, 024, 026, and 029.
(Id.). Under WV/NPDES Permit 1019287, plaintiffs cite post-
complaint violations of aluminum at Outfall 001. (Id.). These
violations are based on the DMRs Powellton submitted to the
WVDEP. (Pls.' Mot. Summ. J., Exs. 3, 7, & 9). Powellton's
response does not dispute plaintiffs' suggestion that these
violations satisfy the first prong of the Gwaltney II test.
(Def.'s Resp. to Pls.'s Mot. Summ. J. at 8). Accordingly, the
court finds that plaintiffs have established that there is no
genuine dispute of material fact as related to these outfalls and
that plaintiffs are entitled to judgment with respect thereto as

---

with a summary of Powellton's post-complaint violations with
greater specificity, including the exact number of post-complaint
violations, the parameters violated, and the outfalls where the
violations occurred. Until that time, the court will treat the
alleged violation of the aluminum limits at Outfall 030 of
WV/NPDES WV1019449 as included within the 18 parameter violations
originally alleged by plaintiffs.

a matter of law under <u>Gwaltney II</u>.  Powellton's motion for summary judgment regarding the continuing violation of these enumerated outfalls is denied.

> 2.  Sporadic or Intermittent Violations Under the
>     Second Prong of the <u>Gwaltney II</u> Test

Plaintiffs argue that the remainder of the violations alleged in their complaint constitute continuing violations of the Clean Water Act under the second prong of the <u>Gwaltney II</u> test.  The second prong requires the plaintiff to adduce "evidence from which a reasonable trier of fact could find a continuing likelihood of a recurrence in intermittent or sporadic violations."  <u>Gwaltney II</u>, 844 F.2d at 171-72.  "Intermittent or sporadic violations do not cease to be ongoing until the date when there is no real likelihood of repetition."  <u>Id.</u> at 172.  In making this determination, the Fourth Circuit instructed district courts "to consider whether remedial actions were taken to cure violations, the <u>ex ante</u> probability that such remedial measures would be effective, and any other evidence presented during the proceedings that bears on whether the risk of defendant's continued violation had been completely eradicated when citizen-plaintiffs filed suit."  <u>Id.</u>

a. Corrective Action for Iron Violations at Outfall 021
   of Permit WV1019279


Powellton contends that several of plaintiffs' claims have been mooted by subsequent corrective action.  To prove that a permit violation has been mooted by voluntary corrective action, a defendant must demonstrate "that it is 'absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.'"  Gwaltney I, 484 U.S. at 66 (quoting United States v. Phosphate Export Ass'n, Inc., 393 U.S. 199, 203 (1952)).  The burden on the defendant is a heavy one.  Gwaltney II, 890 F.2d at 697.  "[W]hether corrective action moots the issue of an ongoing violation vel non is a factual question." Id.

Powellton suggests that the iron violations at Outfall 021 occurred as a result of the placement of reserve stockpiles of iron-rich Stockton coal on the decks of the fill that drained into the outfall.  (Def.'s Resp. at 15-16).  Stockpiles of Stockton coal have been placed on the deck above Outfall 021 at least twice in the past four years.  (Id.)  Powellton claims that the stockpiles have been removed, so "Powellton can begin its final reclamation of this area.  Powellton expects that these

54

corrective action measures will resolve the iron problem at

Outlet 021." (<u>Id.</u> (citation omitted)). Powellton supports its

argument of mootness with the affidavit of Mike W. Isabell,

Manager of Technical Services for Powellton Coal Company, LLC.

(Def.'s Resp. to Pls.' Mot. Summ. J., Ex. 5). The affidavit and

Powellton's 'expectation' that the problem is resolved are

insufficient to make it "absolutely" clear that the violations

could not reasonably be expected to recur. The court declines to

grant summary judgment to either party relating to whether the

iron violations at Outfall 021 of Permit WV1019279 are

continuing.


b. Remaining Violations Alleged in the Complaint


For the remainder of the alleged violations, Powellton

has not provided any evidence of remedial action. Referring to

twelve of the remaining parameters specifically,[18] Powellton

_____

[18] Listed below are the twelve parameters for which
Powellton makes specific <u>Gwaltney</u> arguments. The violations
disputed under Permit WV1019449 include: total suspended solids
at Outfalls 020, 022, and 030; iron violations at Outfalls 020
and 022; and aluminum violations at Outfall 020. The violations
disputed under Permit WV1019279 include: iron violations at
Outfall 001; manganese violation at Outfall 026; and aluminum
violations at Outfalls 005, 012, 018, and 035.

argues that the one-time violations alleged by plaintiffs are anomalies within a near perfect compliance record for those outfalls. (Def.'s Resp. to Pls.' Mot. Summ. J. at 9-12). Powellton claims that plaintiffs rely on "several isolated, one-time violations in their Complaint that clearly cannot pass muster under the Fourth Circuit's test for establishing a continuing violation." (Id. at 9-12). Plaintiffs respond that Powellton has not exhibited a history of compliance for these outfalls but, rather, has benefitted from "fortuitous heavy flows" and lack of "heavy rainfall" among other things. (Pls.' Reply at 12-14). So it is that the parties' arguments depend on factual considerations properly reserved for the trier of fact.

Accordingly, the court concludes that genuine issues of material fact remain as to whether a reasonable trier of fact could find a continuing likelihood of a recurrence in intermittent or sporadic violations for the remaining violations under the second prong of Gwaltney II. The court denies summary judgment to both parties for those parameters outside of the designated twelve post-complaint violations under the first prong of Gwaltney II and reserves the final determination of whether they constitute continuing violations under the Clean Water Act for the trier of fact.

56

E. Plaintiffs' Request That the Court Find Powellton Liable for
   Violations of the Clean Water Act and SMCRA and Grant
   Permanent Injunctive Relief


       As noted, plaintiffs seek declaratory and injunctive

relief for 6,767 alleged violations of the Clean Water Act and

the corresponding 6,767 alleged violations of SMCRA.  As

discussed in Part III.D.1 above, plaintiffs are entitled to

summary judgment only for those post-complaint violations which

fall under the first prong of the Gwaltney II test; the remaining

violations pose genuine issues of material fact to be resolved by

the trier of fact.  Inasmuch as the court withholds ruling on the

question of whether Powellton is in continuing violation of the

Clean Water Act for a significant portion of the violations

alleged by plaintiffs, the court declines to issue a finding as

to the total number of Powellton's violations.  Pending a final

determination of the extent of the violations, the court holds in

abeyance its decision respecting the scope of a permanent

injunction.  The remedy awaits a final determination of the scope

of Powellton's liability.  Consequently, the court denies without

prejudice those portions of plaintiffs' motion seeking

declaratory and injunctive relief pending a final determination

of the nature and extent of the violations alleged.

57

V.

Based upon the foregoing, it is, accordingly,
ORDERED as follows

1.    That Powellton's motion for summary judgment be, and it
      hereby is, denied;

2.    That plaintiffs' motion for summary judgment as to
      Counts 1, 3, and 5 under the Clean Water Act be, and it
      hereby is, granted as to those post-complaint
      violations that constitute continuing violations[19] and
      denied in all other respects; and

3.    That plaintiffs' motion for summary judgment as to
      Counts 2, 4, and 6 under SMCRA be, and it hereby is,
      granted insofar as the claims correspond to the post-
      complaint continuing violations under the Clean Water
      Act and denied in all other respects.

_____

[19] Specifically the court grants summary judgment as to the
following post-complaint violations discussed in Part III.D.1
above: total suspended solids violations at Outfall 027, iron
violations at Outfall 027 and 030, and aluminum violations at
Outfalls 027, 028, 029, and 030 under WV/NPDES Permit 1019449;
manganese violations at Outfall 002 and aluminum violations at
Outfalls 001, 002, 003, 014, 019, 020, 021, 022, 023, 024, 026,
and 029 under WV/NPDES Permit 1019279; and aluminum violations at
Outfall 001 under WV/NPDES Permit 1019287.

The Clerk is directed to forward copies of this

memorandum opinion and order to all counsel of record.

DATED: February 3, 2010

John T. Copenhaver, Jr.
United States District Judge