**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHER DISTRICT OF WEST VIRGINIA**
**CHARLESTON DIVISION**

| | |
|---|---|
| _____ )<br>SIERRA CLUB and ANSTED HISTORIC )<br>PRESERVATION COUNCIL, INC., )<br> )<br>Plaintiffs, )<br> )<br>v. )<br> )<br>POWELLTON COAL COMPANY, )<br> )<br>Defendant. )<br>_____) | Civil Action No. 2:08-1363<br>Hon. John T. Copenhaver, Jr.<br><br>CONSENT DECREE |

## I. RECITALS

1.     On November 24, 2008, Plaintiffs the Sierra Club and Ansted Historic Preservation Council, Inc. (collectively "Plaintiffs") filed a Complaint for Declaratory and Injunctive Relief and for Civil Penalties in this civil action against Defendant Powellton Coal Company, LLC ("Defendant").[1]  Plaintiffs filed their First Amended Complaint for Declaratory and Injunctive Relief and for Civil Penalties ("Complaint") on May 15, 2009.

2.     The Complaint alleged that Defendant had discharged concentrations of total suspended solids, iron, manganese and aluminum in excess of the effluent limits for those parameters contained in the West Virginia / National Pollution Discharge Elimination System ("WV/NPDES") permits for the Bridge Fork (WV/NPDES Permit No. WV1019279) and Bridge Fork West (WV/NPDES Permit No. WV1019449) Surface Mines and the associated haul road and loadout (WV/NPDES Permit No. WV1019287).  These permits were issued to Defendant by the West Virginia Department of Environmental Protection ("WVDEP") pursuant to Section 402

---

[1] Fola Coal Company, LLC d/b/a Powellton Coal Company is the full name of the entity named as the defendant in this case.

of the federal Clean Water Act ("CWA").  The Complaint further alleged that Defendant's discharges of the above-listed parameters in concentrations exceeding those permitted by its WV/NPDES permits constituted a violation of the performance standards under the federal Surface Mining Control and Reclamation Act of 1977 ("SMCRA").

3.     On June 18, 2009, Plaintiffs filed a motion for partial summary judgment on their CWA claims and for summary judgment on their SMCRA claims.  On June 18, 2009, Defendant filed a motion for summary judgment as to all of Plaintiffs' claims.  On February 3, 2010, the Court granted in part and denied in part Plaintiffs' motion for partial summary judgment, and denied Defendant's motion for summary judgment.  By order dated April 26, 2010, the Court granted Plaintiffs' motion for summary judgment as to those specific WV/NPDES permitted outfalls and parameters identified in paragraph 1 of that Order, and denied Plaintiffs' motion for summary judgment as to the remainder of the violations alleged in Plaintiffs' Complaint.

4.     The Parties recognize, and the Court by entering this Consent Decree finds, that the Consent Decree has been negotiated by the Parties in good faith and will avoid further litigation among the Parties, and that this Decree is fair, reasonable and in the public interest.

NOW, THEREFORE, with the consent of the Parties, IT IS HEREBY ADJUDGED, ORDERED AND DECREED as follows:

## II.  JURISDICTION AND VENUE

5.     This Court has jurisdiction over the Parties and over the subject matter of this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), 33 U.S.C. § 1365 (CWA citizen suit provision) and 30 U.S.C. § 1270 (SMCRA citizen suit provision).

6.     Venue is proper in the Southern District of West Virginia pursuant to 28 U.S.C. § 1391(b) and (c), because it is the judicial district in which Defendant is located, resides and/or

does business, and/or which the violations in the Complaint occurred, as well as 33 U.S.C. § 1365(c)(1), because the sources of the CWA violations are located in this judicial district, and 30 U.S.C. § 1270(c), because the coal mining operations complained of are located in this judicial district.

7.     For purposes of this Consent Decree, or any action to enforce this Consent Decree, Defendant consents to this Court's jurisdiction over this Consent Decree and consents to venue in this judicial district.

## III.  APPLICABILITY

8.     The provisions of this Consent Decree apply to and are binding upon Plaintiffs, upon Defendant and any of their respective successors and/or assigns, and upon other persons or entities otherwise bound by the law.

9.     No transfer of ownership or operation of any Facility, whether in compliance with the procedures of this Paragraph or otherwise, shall relieve Defendant of its obligation to ensure that the terms of this Consent Decree are implemented.  Prior to any transfer, Defendant shall provide a copy of this Consent Decree to the proposed transferee and require the transferee to provide written confirmation acknowledging the terms of the Consent Decree.

10.     Defendant shall provide a copy of this Consent Decree to all officers, employees and agents whose duties include compliance with any provision of this Consent Decree, as well as to any contractor retained to perform work required under this Consent Decree.

## IV.  DEFINITIONS

11.     Terms used in this Consent Decree that are defined in the CWA, SMCRA or in regulations issued pursuant thereto shall have the meanings assigned to them therein, unless

otherwise provided in this Decree.  Whenever the terms set forth below are used in this Consent Decree, the following definitions shall apply:

      a.     "Complaint" shall mean the First Amended Complaint for Declaratory and Injunctive Relief filed by Plaintiffs in this action on May 15, 2009;

      b.     "Consent Decree" or "Decree" shall mean this Consent Decree and all appendices attached hereto;

      c.     "Daily maximum violation" shall mean an exceedance of the effective daily maximum effluent limit of the applicable WV/NPDES Permit.

      d.     "Day" shall mean a calendar day unless expressly stated to be a business day.  In computing any period of time under this Consent Decree, where the last day would fall on a Saturday, Sunday or federal holiday, the period shall run until the close of business of the next business day;

      e.     "DMR" means a Discharge Monitoring Report for one of the WV/NPDES permits identified herein.

      f.     "Effective Date" shall have the definition provided in Section XV;

      g.     "Facility" or "Facilities" shall mean Defendant's mining operations subject to WV/NPDES Permit Nos. WV1019279, WV1019449 and WV1019287;

      h.     "In-stream pond" shall mean a permitted WV/NPDES outlet from which the effluent is discharged directly into the receiving stream.  For purposes of determining any stipulated penalty, each of the following outlets, shall be considered an "in-stream pond":

      i.     Outfall 001 of WV/NPDES Permit WV1019279;

      ii.     Outfall 021 of WV/NPDES Permit WV1019279;

      iii.     Outfall 024 of WV/NPDES Permit WV1019279;

     iv.     Outfall 029 of WV/NPDES Permit WV1019279;

     v.     Outfall 027 of WV/NPDES Permit WV1019449;

     vi.     Outfall 028 of WV/NPDES Permit WV1019449;

     vii.     Outfall 029 of WV/NPDES Permit WV1019449;

     viii.     Outfall 030 of WV/NPDES Permit WV1019449; and

     ix.     Outfall 001 of WV/NPDES Permit WV1019287.

i.     "Maximum daily effluent limit" shall mean maximum daily discharge limitation as defined in 40 C.F.R. § 122.2;

j.     "Monthly average effluent limit" shall mean average monthly discharge limitation as defined in 40 C.F.R. § 122.2;

k.     "Monthly average violation" shall mean an exceedance of the effective monthly average effluent limit of the applicable WV/NPDES Permit.

l.     "On-bench outlet" shall mean a permitted WV/NPDES outlet from which the discharged effluent must travel overland for some distance before reaching the receiving stream.

m.     "Outlet" or "Outfall" shall mean a WV/NPDES-permitted discharge point where monitoring and sampling is conducted pursuant to a WV/NPDES permit;

n.     "Paragraph" shall mean a portion of this Consent Decree identified by an Arabic numeral;

o.     "Parties" shall mean Plaintiffs and Defendant;

p.     "Section" shall mean a portion of this Consent Decree identified by a Roman numeral;

q.     "State" shall mean the State of West Virginia;

r.      "USEPA" shall mean the United States Environmental Protection Agency and any of its successor departments or agencies;

s.      "WVDEP" shall mean the West Virginia Department of Environmental Protection;

t.      "WV/NPDES permit" shall mean a West Virginia / National Pollutant Discharge Elimination System permit issued by WVDEP pursuant to Section 402 of the CWA.

## V.  CIVIL PENALTY

12.      Defendant shall pay a civil penalty in the amount of $ 134,700.00 to the United States as set forth in Paragraph 13 below.  Together with the Supplemental Environmental Project to be funded as set forth in Section VI, the payment of this civil penalty is made in settlement of all of Plaintiffs' claims in this action under the CWA and SMCRA for effluent limit violations occurring prior to the effective date of this Consent Decree.

13.      Defendant shall pay the civil penalty due to the United States Treasury within twenty (20) days of the entry of this Decree.  That payment shall be made by certified check, bank check, or money order to the Treasurer of the United States and should be sent to the following address:  Debt Collection Specialist, Environment and Natural Resources Division, Executive Office, PO Box 7754, Ben Franklin Station, Washington D.C. 20044-7754.  The check or money order shall reference *Sierra Club et al. v. Powellton Coal Company, LLC*, Civil Action No. 2:08-cv-1363, and payment shall be considered paid upon mailing, or direct delivery to the specified address.  A copy of the check and cover letter shall be sent to Plaintiffs at the time payment is made, and shall state that payment is being made pursuant to this Decree.

14.      The sum set forth in Paragraph 12, supra, shall completely discharge Defendant from any liability under 33 U.S.C. § 1365 and 30 U.S.C. § 1270 arising from any violations of

WV/NPDES Permit Nos. WV1019279, WV1019449 and WV1019287 that have occurred or may occur up to and including the date of entry of this Consent Decree.

15.     Defendant shall not deduct any penalties paid under this Consent Decree pursuant to this Section in calculating its federal, state or local income tax.

## VI.     SUPPLEMENTAL ENVIRONMENTAL PROJECT

16.     In addition to the civil penalty set forth in Section V, supra, Defendant shall pay a total of $1,212,000.00 to the West Virginia University College of Law in order to fund a Supplemental Environmental Project ("SEP").

17.     The SEP funds will create a Land Use and Sustainable Development Clinic ("the Clinic") at the West Virginia University College of Law.  Appendix A to this Consent Decree describes the Clinic, its four-year budget, how it will assess and report its performance, and how the Clinic relates to the terms of USEPA's Supplemental Environmental Projects Policy.

18.     The SEP will have a significant impact on the communities in the Gauley River and New River watersheds and the watersheds themselves.  Portions of both the Gauley and New Rivers are under the jurisdiction of the National Park Service:  the Gauley River National Recreation Area and the New River National River.  Both rivers provide some of the best whitewater rafting in the eastern United States and attract tourists to the region from around the world.

19.     These communities would benefit from additional legal resources to protect their land and water.  This SEP will build capacity within the rural communities in the geographic area to protect their ground and surface water.

20. Defendant shall remit the funds identified in this Paragraph by certified check, bank check, or money order to the West Virginia University Foundation within twenty (20) days of the entry of this Decree and shall send the funds to the following address:

> West Virginia University Foundation
> 1 Waterfront Place, 7th Floor
> P.O. Box 1650
> Morgantown, WV 26506

The check or money order shall reference *Sierra Club et al v. Powellton Coal Company, LLC,* Civil Action No. 2:08-1363, and payment shall be considered paid upon mailing, or direct delivery to the specified address. A copy of the check and cover letter shall be sent to Plaintiffs at the time payment is made, and shall state that payment is being made pursuant to this Decree.

21. Defendant shall not deduct its contribution to the SEP or any payments made pursuant to Section X ("Stipulated Payments") in calculating its federal, state or local income tax.

## VII. COMPLIANCE REQUIREMENTS

22. This Consent Decree in no way affects or relieves Defendant of its responsibility to comply with applicable federal, state and local laws, regulations and permits.

23. Defendant shall perform the work required by this Consent Decree in compliance with the requirements of all federal, state and local laws, regulations and permits.

24. Where any compliance obligation under this Section requires Defendant to obtain a federal, state or local permit or approval, Defendant shall submit timely and substantially complete applications and take all other actions necessary to obtain all such permits or approvals. Defendant may seek relief under the provisions of Section XI of this Consent Decree ("Force Majeure") for any delay in the performance of any such obligation resulting from a failure to obtain, or a delay in obtaining, any permit or approval required to fulfill such obligation, if Defendant has submitted

timely and substantially complete applications and have taken all other actions necessary to obtain all such permits or approvals.

### VIII.  <u>INJUNCTIVE RELIEF</u>

25.    <u>Aluminum Treatment</u>.  Defendant shall comply with the schedule set forth in the Aluminum Treatment Action Plan ("Action Plan") attached to this Consent Decree as Appendix B.  The Action Plan is designed to (a) identify the basis of elevated aluminum concentrations in the discharge from Defendant's WV/NPDES-permitted Outlets, (b) develop solutions for the reduction of aluminum concentrations and (c) implement long-term operating procedures and programs that will result in compliance with Defendant's effluent limits for aluminum in its WV/NPDES permits.

26.    <u>Staffing</u>.  Defendant shall hire or designate a full-time employee whose time will be dedicated to environmental compliance issues at the Facility.

27.    <u>Treatment System Audits</u>.  Defendant shall hire a third party consultant not currently employed by Defendant for the purpose of conducting an audit of treatment systems at the outlets specified in Appendix B for the control of pollutants other than aluminum that were the subject of this litigation (i.e., manganese, TSS and iron).  The consultant selected shall have engineering expertise, and shall complete an initial audit for the specified outlets no later than January 31, 2011.  Subsequent audits shall be conducted annually thereafter during the term of this Consent Decree.  A copy of each treatment system audit shall be provided to Plaintiffs.

28.    <u>Effluent Testing – Aluminum v. Rainfall</u>.  Defendant shall undertake monitoring for aluminum at the toe of Valley Fill No. 1 and at the toe of Valley Fill No. 2A, both located on the Bridge Fork Surface Mine.  This monitoring shall be conducted in accordance with the sampling plan set forth in Appendix C in order to evaluate the contribution of aluminum from

groundwater flow from the toe of the fill as well as the contribution of aluminum from surface runoff.  A report summarizing the monitoring results shall be prepared no later than July 31, 2011, a copy of which shall be provided to Plaintiffs.

29.     <u>Effluent Limit Violation Response Program (Non-Aluminum Parameters)</u>. Defendant will investigate an effluent limit violation of a non-aluminum parameter (i.e., manganese, TSS or iron) within seven (7) days of receipt of analytical results indicating that such a violation has occurred, and promptly develop and implement corrective action(s) to address the exceedance.  Defendant will document all corrective measures undertaken pursuant to this Paragraph in the quarterly reports required to be submitted pursuant to Paragraph 31 of this Consent Decree.

30.     <u>Training</u>.    Defendant shall provide training to all employees that have responsibility for CWA and SMCRA permit compliance.  Such training will focus on proper practices to prevent effluent violations, will include training on compliance with the terms of this Consent Decree, and will be provided annually until termination of this Consent Decree.

## IX.  REPORTING REQUIREMENTS

31.     Defendant shall submit quarterly reports within 30 Days after the end of each calendar-year quarter (*i.e.,* by April 30, July 31, October 31, and January 31) after the Effective Date of this Consent Decree until Termination of this Decree pursuant to Section XVIII.  Each written quarterly report shall include, for the preceding quarter:

a.     The status of any construction or compliance measures undertaken; completion of milestones; and problems encountered or anticipated, together with implemented or proposed solutions;

b.     A description of any noncompliance with the requirements of this Consent

Decree and an explanation of the violation's likely cause and the remedial steps taken, or to be taken, to prevent or minimize such violation; and

    c.  A description of violation of this Consent Decree for which Defendant has submitted to Plaintiffs an unresolved Force Majeure claim or intends to submit a Force Majeure claim pursuant to Section XI of this Consent Decree.

  32.  All reports shall be submitted to the persons designated in Section XIV of this Consent Decree ("Notices").

  33.  The reporting requirements of this Consent Decree do not relieve Defendant of any reporting obligation required by the CWA, SMCRA or their implementing regulations, or by any other federal, state or local law, regulation, permit or other requirement.

  34.  Any information provided pursuant to this Consent Decree may be used by Plaintiffs in any proceeding to enforce the provisions of this Consent Decree and as otherwise permitted by law.

## X. <u>STIPULATED PAYMENTS</u>

  35.  Defendants shall be liable for stipulated payments for violations as specified below, unless excused under Section XI ("Force Majeure").

  36.  Stipulated payments shall be paid to the West Virginia University College of Law to provide further funding to the Clinic identified in the SEP described in Section VI.

  37.  Accrued stipulated payments shall be satisfied in full through payment as set forth in Paragraphs 36 and 42.

  38.  A daily maximum violation or monthly average violation as reported on Defendant's DMRs shall constitute one (1) violation for purposes of this Section.

  39.  Plaintiffs may, in the unreviewable exercise of their discretion, reduce or waive

stipulated payments otherwise due under this Consent Decree.

40.     Subject to the provisions of Section XII of this Consent Decree ("Effect of Settlement/Reservation of Rights"), the stipulated payments provided for in this Consent Decree shall be in addition to any other rights, remedies or sanctions, except civil penalties, available to Plaintiffs for Defendant's violation of this Consent Decree or applicable law.  Where a violation of this Consent Decree is also a violation of relevant statutory or regulatory requirements, Defendant shall be allowed a credit, for stipulated payments made against any statutory penalties imposed for such violation.  In the event of future litigation involving claims based on violations for which stipulated payments have been paid pursuant to this Decree, any such payments made by Defendant in accordance with this Section shall be considered the equivalent of stipulated penalties, and shall offset any penalty assessed for those violations.

41.     <u>Noncompliance with NPDES Permit Limits</u>:  The following stipulated payments shall accrue per violation for each reported daily maximum violation or monthly average violation on Defendant's DMRs for the parameters and the outlets identified in paragraph 1 of this Court's Order dated April 26, 2010 (Docket #75, Attached as Appendix D to this Decree):

a.     For each in-stream pond daily maximum violation:  (i) $2000 for the first year following the Effective Date of this Consent Decree; (ii) $4000 for the second year following the Effective Date of this Consent Decree; and (iii) $6000 for the third year following the Effective Date of this Consent Decree.

b.     For each in-stream pond monthly average violation:  (i) $3000 for the first year following the Effective Date of this Consent Decree; (ii) $6000 for the second year following the Effective Date of this Consent Decree; and (iii) $12,000 for the third year following the Effective Date of this Consent Decree.

c.      For each on-bench outlet pond daily maximum violation:  (i) $1000 for the first year following the Effective Date of this Consent Decree; (ii) $2500 for the second year following the Effective Date of this Consent Decree; and (iii) $5000 for the third year following the Effective Date of this Consent Decree.

d.      For each on-bench outlet monthly average violation:  (i) $2000 for the first year following the Effective Date of this Consent Decree; (ii) $5000 for the second year following the Effective Date of this Consent Decree; and (iii) $10,000 for the third year following the Effective Date of this Consent Decree.

42.     Defendant shall submit stipulated payments due as a result of noncompliance under Paragraph 41 at the end the 30 Day period following the conclusion of each calendar quarter (i.e., by April 30, July 31, October 31 and January 31).  Defendant shall make payments to the West Virginia University College of Law following the procedure specified in Section VI herein.  Notice of such payment shall be sent to Plaintiffs with Defendant's quarterly reports required by Paragraph 27.

43.     For violations of the effluent limitations of WV/NPDES Permits WV1019279, WV1019449, and WV1019287 that have occurred or do occur between September 1, 2010, and the entry of this Decree, Defendant will pay stipulated payments in the manner provided in Paragraphs 36, 41, and 42, as if those violations had occurred during the first year following the Effective Date of the Consent Decree.

## XI.  FORCE MAJEURE

44.     "Force Majeure," for purposes of this Consent Decree, is defined as any event arising from causes beyond the control of Defendant, of any entity controlled by Defendant, or of Defendant's contractors, which delays or prevents the performance of any obligation under this

Consent Decree despite Defendant's best efforts to fulfill the obligation.  The requirement that Defendant exercise "best efforts to fulfill the obligation" includes using best efforts to anticipate any potential Force Majeure event and best efforts to address the effects of any such event (a) as it is occurring and (b) after it has occurred to prevent or minimize any resulting delay to the greatest extent possible.  "Force Majeure" does not include Defendant's financial inability to perform any obligation under this Consent Decree.

45.     If any event occurs or has occurred that may delay the performance of any obligation under this Consent Decree, whether or not caused by a Force Majeure event, Defendant shall provide notice orally or by electronic or facsimile transmission to Plaintiffs within five (5) days of when Defendant first knew that the event might cause a delay.  Within 14 Days thereafter, Defendant shall provide in writing to Plaintiffs an explanation of the reasons for the delay; the anticipated duration of the delay; and actions taken or to be taken to prevent or minimize the delay.

46.     If Plaintiffs agree that the delay or anticipated delay is attributable to a Force Majeure event, the time for performance of the obligations under this Consent Decree that are affected by the Force Majeure event will be extended by Plaintiffs for such time as is necessary to complete those obligations.  An extension of the time for performance of the obligations affected by the Force Majeure event shall not, of itself, extend the time for performance of any other obligation.  Plaintiffs will notify Defendant in writing within 5 days of the length of the extension, if any, for performance of the obligations affected by the Force Majeure event.

47.     If Plaintiffs do not agree that the delay or anticipated delay has been or will be caused by a Force Majeure event, Plaintiffs will notify Defendant in writing of its decision with five (5) days of its receipt of the Force Majeure claim by Defendant.

## XII.  EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS

48.    This Consent Decree resolves the civil claims of Plaintiffs for the violations alleged in the Complaint filed in this action.

49.    Plaintiffs reserve all legal and equitable remedies available to enforce the provisions of this Consent Decree, except as expressly stated in Paragraph 48.  This Consent Decree shall not be construed to limit the rights of Plaintiffs to obtain penalties or injunctive relief under the CWA, SMCRA or implementing regulations, or under other federal or state laws, regulations or permit conditions, except as expressly specified in Paragraph 48.

50.    Defendant's compliance with this Consent Decree shall be no defense to any action commenced pursuant to any such laws, regulations or permits, except as set forth herein. Plaintiffs do not, by their consent to the entry of this Consent Decree, warrant or aver in any manner that Defendant's compliance with any aspect of this Consent Decree shall result in compliance with provisions of the Act, 33 U.S.C. § 1311, *et seq.,* or with any other provisions of federal, state or local laws, regulations or permits.

51.    This Consent Decree does not limit or affect the rights of Defendant or Plaintiffs against any third parties not party to this Consent Decree, nor does it limit the rights of third parties, not party to this Consent Decree, against Defendants, except as otherwise provided by law.

52.    This Consent Decree shall not be construed to create rights in, or grant any cause of action to, any third party not party to this Consent Decree.

# XIII.  COSTS

53.     Defendant shall pay reasonable costs and attorneys' fees, including expert witness fees and costs incurred by Plaintiffs in conjunction with this civil action through the Effective Date of this Consent Decree, in accordance with the fee-shifting provisions of the CWA and SMCRA.  The Parties have agreed that those costs and fees total $ 99,736.20.  Of that amount, $ 93,380 is for Plaintiffs' reasonable attorneys' fees, to the Appalachian Center for the Economy and the Environment, Inc., allocated as follows:

      a.   $79,980 for Derek Teaney's 372 hours at the reasonable rate of $215/hour; and

      b.   $13,400 for Joseph Lovett's 40 hours at the reasonable rate of $335/hour.

54.     Not later than twenty (20) days from the entry of this Consent Decree, Defendant shall deliver to Plaintiffs' counsel a check for $ 99,736.20 made payable to the Appalachian Center for the Economy and the Environment, Inc. The Appalachian Center for the Economy and the Environment, Inc., shall be wholly responsible for the proper distribution of any portions of the delivered sum to any and all other attorneys, experts or other entities who may be entitled thereto.  The sum delivered under this paragraph shall be a complete settlement of Plaintiffs' claims for costs and fees incurred up to the Effective Date of this Consent Decree, and thereafter for responding to possible comments on this Decree by the Department of Justice.

55.     Plaintiffs retain the right to seek costs, including attorneys' and expert witness fees, for their work related to (a) monitoring Defendant's compliance with the Decree, and (b) proceedings to interpret or enforce the terms of the Decree.

# XIV.  <u>NOTICES</u>

56.     Unless otherwise specified herein, whenever notifications, submissions, reports or communications are required by this Consent Decree, they shall be made in writing and addressed as follows:

<u>To Plaintiffs</u>:

Derek Teaney
Appalachian Center for the Economy and the Environment
P.O. Box 507
Lewisburg, WV 24901

<u>To Defendant:</u>

Steve Hicks, Manager Engineering - Fola Coal
2112 Leatherwood Road
Bickmore, WV 25019

With a copy to:
Legal Department
CONSOL Energy Inc.
1000 Consol Energy Drive
Canonsburg, PA 15317

57.     Any Party may, by written notice to the other Parties, change its designated notice recipient or notice address provided above.

58.     Notices submitted pursuant to this Section shall be deemed submitted upon mailing, unless otherwise provided in this Consent Decree or by mutual agreement of the Parties in writing.

# XV.  <u>EFFECTIVE DATE</u>

59.     The Effective Date of this Consent Decree shall be the date upon which this Consent Decree is entered by the Court or a motion to enter this Consent Decree is granted, whichever occurs first, as recorded on the Court's docket.

## XVI.  <u>RETENTION OF JURISDICTION</u>

60.    The Court shall retain jurisdiction over this case until termination of this Consent Decree, for the purpose of resolving disputes arising under this Decree or entering orders modifying this Decree, pursuant to Section XVII ("Modification") or effectuating or enforcing compliance with the terms of this Decree.

61.    Plaintiffs and Defendant reserve all legal and equitable rights and defenses available to them to enforce or defend the provisions of this Consent Decree.  Before a Party invokes the Court's jurisdiction to interpret, enforce or modify this Decree, the Party shall send a written notice to the other Party outlining the nature of the matter and requesting informal negotiations among the principals and counsel to resolve the matter.  If the Parties are unable to resolve the matter within 30 days from the date of the notice (or within an additional period of time agreed to by the Parties), any Party may request the Court to resolve the matter.

## XVII.  <u>MODIFICATION</u>

62.    The terms of this Consent Decree, including any attached appendices, may be modified only by a subsequent written agreement signed by all Parties.  Where the modification constitutes a material change to this Decree, it shall be effective only upon approval by the Court.

## XVIII.  <u>TERMINATION</u>

63.    This Consent Decree shall terminate automatically three (3) years from the Effective Date of this Decree.

## XIX.  SIGNATORIES/SERVICE

64.     Each undersigned representative of Plaintiffs and Defendant certifies that he or she is fully authorized to enter into the terms and conditions of this Consent Decree and to execute and legally bind the Party he or she represents to this document.

65.     This Consent Decree may be signed in counterparts, and its validity shall not be challenged on that basis.

## XX.  INTEGRATION

66.     This Consent Decree constitutes the final, complete, and exclusive agreement and understanding among the Parties with respect to the settlement embodied in the Decree and supersedes all prior agreements and understandings, whether oral or written, concerning the settlement embodied herein.  Other than deliverables that are subsequently submitted and approved pursuant to this Decree, no other document, nor any representation, inducement, agreement, understanding or promise, constitutes any part of this Decree or the settlement it represents, nor shall it be used in construing the terms of this Decree.

## XXI. FINAL JUDGMENT

67.     Upon approval and entry of this Consent Decree by the Court, this Consent Decree shall constitute a final judgment of the Court as to Plaintiffs and Defendant.  The Court finds that there is no just reason for delay and therefore enters this judgment as a final judgment under Fed. R. Civ. P. 54 and 58.

## XXII. APPENDICES

68.     The following appendices are attached to and part of this Consent Decree:

Appendix A – Description of SEP Funding of the Land Use and Sustainable

Development Clinic at West Virginia University College of Law

Appendix B – Aluminum Action Plan

Appendix C – Stormwater Sampling Study

Appendix D – April 26, 2010 Order

ENTER:   _____ __,  2010

_____
JOHN T. COPENHAVER, JR.
UNITED STATES DISTRICT JUDGE

For the Plaintiffs Sierra Club and Ansted Historic Preservation Council

Dated: September 15, 2010_____        **/s/ Derek O. Teaney**_____
                                         DEREK O. TEANEY (WV Bar No. 10223)
                                         Appalachian Center for the Economy and the
                                            Environment
                                         P.O. Box 507
                                         Lewisburg, WV 24901
                                         304-793-9007

For the Defendant Powellton Coal Company, LLC

Dated: September 15, 2010_____        **/s/ Allyn G. Turner**_____
                                         ALLYN G. TURNER (WV Bar No. 5561)
                                         Spilman Thomas & Battle, PLLC
                                         Post Office Box 273
                                         Charleston, WV 25321-0273
                                         304-340-3800

## APPENDIX A

WVU COLLEGE OF LAW PROPOSAL FOR LAND USE AND
SUSTAINABLE DEVELOPMENT LAW CLINIC

## INTRODUCTION

The West Virginia University College of Law (College of Law) proposes to develop a
Land Use and Sustainable Development Law Clinic (Clinic) as a Supplemental
Environmental Project (SEP).  The Clinic will focus on providing transactional legal
services to individuals, non-governmental organizations (NGOs), local governments and
communities required to address land use and conservation needs in the Gauley and New
River (West Virginia Section) Watersheds to protect water quality and quantity for
sustainable communities.  By focusing on these Watersheds, the Clinic will assist in
addressing important other water quality issues in the same waters where contour surface
mining has taken place and has been at issue in the recent litigation.

Through the initial funding of the Clinic as a Supplemental Environmental Project (SEP)
focused on the two Watersheds, the Clinic will be positioned to provide transactional
legal services to address unmet land use and sustainable development needs of the state.
West Virginia has significant needs for funding for land and water conservation.  Other
neighboring states have more resources than West Virginia in terms of public and private
conservation infrastructure to support conservation efforts.  The Clinic will provide an
excellent opportunity to provide legal services to environmentally impacted areas in the
state and to build the experience and expertise of lawyers in land use and sustainable
development.

The Clinic Proposal provides the following:

- Description of the expertise and capacity of the College of Law to accomplish
  Clinic goals.
- Description of Clinic structure.
- Analysis of nexus between the violation and Clinic as a SEP.
- Description of assessment criteria and reporting responsibility.
- Explanation of budget and funding allocations of the College of Law and the SEP.

## EXPERTISE AND CAPACITY

With a 132-year history of service to the state, the College of Law remains West
Virginia's sole law school.  The College of Law currently has five clinics, most of which
have served West Virginia citizens for decades.  In addition, the College of Law has
engaged in four extensive land use and sustainable development projects in which faculty
and students provided legal services to rural communities to address land conservation
and water quality.  The long-term clinical experience and the four projects described
below demonstrate the College of Law's expertise and capacity to fulfill the Clinic's
goals.

- **RURAL COMMUNITIES LAND USE/WATER PROTECTION PROJECT**

  Faculty Member:  Dean Joyce McConnell
  Partnership:  Water Research Institute at WVU
  Funding:  USGS Grant & WVU College of Law

  Description:  Over a period of six years, eight law students under the supervision of Dean McConnell worked with rural communities and county commissions in West Virginia to develop land use plans, primarily for ground water protection. Counties in West Virginia included Monroe County, Greenbrier County, Berkeley County and Jefferson County.  Students worked in teams with hydrogeologists, facilitated community meetings, assisted county commissioners, and provided legal support for land use plans.

- **RURAL COMMUNITIES FARMLAND PROTECTION**

  Faculty Member:  Dean Joyce McConnell
  Partnership:  WV Department of Agriculture and USDA
  Funding:   WVU College of Law

  Description:   Over a period of ten years, six law students under the supervision of Dean McConnell worked with rural communities and county commissions in West Virginia to develop farmland protection programs.  Students participated in training for county commissions throughout the state, worked directly with individual county commissions and supported individual farmland protection advocates.  Students also worked with conservationists throughout West Virginia to meet with landowners interested in conserving property through conservation easements.  This project was focused primarily on capacity building in the counties and the project has been very successful.  Nineteen counties now have farmland protection boards.  A total of 11,475 acres have been protected.

- **RURAL COMMUNITIES LAND CONSERVATION SUPPORT**

  Faculty Member:  Dean Joyce McConnell
  Partnership:  WV-based conservation NGOs, state and federal agencies
  Funding:  WVU College of Law

  Description:  Over a ten-year period, student volunteers, under the supervision of Dean McConnell, worked with WV-based conservation NGOs, state and federal agencies to address legal issues raised by community-based land conservation efforts.  Examples include consulting on riparian easements for stream protection, consulting on timbering and stream sedimentation, and working with NGOs on land conservation through sale or donation of development rights or fee simple interests.

- RURAL COMMUNITIES WASTE WATER PROJECT

  Faculty Member:  Dean Joyce McConnell
  Partnership:  National Environmental Training Center at WVU
  Funding:  USDA Rural Development Grant & WVU College of Law

  Description:  Over a period of three years, eight law students under the supervision of Dean McConnell worked with small rural communities in West Virginia and other states (Idaho, Kentucky, New Mexico, Utah and Washington) to find alternative wastewater treatment solutions.  Most of the residences in these communities either used no treatment and straight-piped into streams or had failed septic systems.  With a team of law students and engineers, teams worked with local communities on decentralized systems to serve the community.   The work included meeting with community groups, real property research, real property transactions and facilitating the creation of waste water management entities.  Each project took years.  One community actually qualified for a federal grant and became connected to a nearby city's central system.  Other communities used community managed individual septic systems with community drainfields.

## CLINIC STRUCTURE

Under the supervision of a College of Law faculty member(s), second and third-year students will work with individuals, NGOs, local governments, and communities within the Watersheds to provide transactional legal assistance to protect and enhance water quality, particularly the quality of streams flowing into the Gauley and the New Rivers. The Clinic will be a transactional/non-litigation based program in which students will assist in protecting land and water.  Legal services will be directed to the following goals:

1. To protect land essential to watershed protection through conservation/riparian easements or other land and water protection strategies.
2. To draft land use plans and ordinances, where needed and possible to protect ground and surface water quality and quantity.
3. To solve residential wastewater issues, such as "straight piping" (pipes that carry human waste from a residence or business without treatment directly to a stream) to protect both ground and surface water.

## NEXUS WITH THE IMPACTED WATERSHED

The Environmental Protection Agency SEP Policy and the Legal Guidelines require that a nexus exist between the violation and the proposed project, but warns that ecosystem or geographic proximity alone is insufficient to establish a nexus.  The proposed Clinic meets the nexus requirement as follows:

1. The activities subject to the Consent Decree have the potential to degrade water quality in the Gauley and New River Watersheds and the Clinic's use of the funds allocated will benefit communities in the Watersheds.
2. The Clinic services will addresses potential degradation of the Watersheds by focusing on the overall issue of ground and surface water quality.

<u>ASSESSMENT CRITERIA AND REPORTING SCHEDULE</u>

The College of Law will report semi-annually to the United States Department of Justice. Assessment, based on the Clinic's goals and four-year projected funding as a SEP, will be outcome based on the Criteria below:

- Narrative description of how clinic activities meet established criteria.
- Quantitative data on number of clients, number of client contacts, category of clients, geographic location of clients, legal services requested, legal needs identified, legal needs addressed, legal solutions employed.
- Narrative descriptions and quantitative data on number of experts, category of experts, site visits of experts, use of experts in legal services provided.
- Narrative descriptions and quantitative data on faculty time and student time dedicated to the provision of services within the Watersheds.
- Narrative identifying met and unmet land use and sustainable development legal needs.
- Narrative goals for completion of ongoing projects.

After two years of full operation of the Clinic, the semi-annual Reports will also include metrics of results developed on the basis of the initial outcomes.

<u>BUDGET</u>

The Land Use and Sustainable Development Law Clinic's total four-year budget is $2,155,390 dollars:  $1,212,300 (56%) to be funded by the SEP and $943,090 (44%) to be funded by the College of Law.  A detailed budget is attached as a separate document and incorporated into this Proposal.

**Sustainable Development Law Clinic**
**Preliminary Budget Estimates**
**Four-year Totals**

| | Total Costs | Settlement Contribution | Percent | WVU Law Contribution | Percent |
|---|---|---|---|---|---|
| Personnel | | | | | |
| Faculty Director | 560,000 | 229,600 | 41% | 330,400 | 59% |
| Part-time Clinical Faculty | 140,000 | 57,400 | 41% | 82,600 | 59% |
| Fringe Benefits (@25%) | 175,000 | 71,750 | 41% | 103,250 | 59% |
| Consultants | | | | | |
| Individual Expert Professionals | 200,000 | 200,000 | 100% | - | 0% |
| Equipment and Operations | | | | | |
| Filing fees | 50,000 | 50,000 | 100% | - | 0% |
| Supplies & Equipment | 25,000 | 20,000 | 80% | 5,000 | 20% |
| Travel, Training, Conferences | 90,000 | 60,000 | 67% | 30,000 | 33% |
| Septic program funds | 177,300 | 177,300 | 100% | - | 0% |
| Easement fees and costs | 310,000 | 310,000 | 100% | - | 0% |
| Rent (3 years) | 36,250 | 36,250 | 100% | - | 0% |
| Overhead | | | | | |
| Internal Indirect Costs (31.6%) | 391,840 | - | 0% | 391,840 | 100% |
| Total | 2,155,390 | 1,212,300 | 56% | 943,090 | 44% |

# Proposed Action Plan to be included as component of Settlement of *Sierra Club v. Powellton Coal Co., Civ. No. 2:08-1363*

## BACKGROUND INFORMATION

Fola Coal Company, LLC d/b/a Powellton Coal Company (Powellton) has several surface mining operations located near Jodie, West Virginia. Various mining and water permits associated with properties under the control of Powellton have 27 water discharge outlets and nine in-stream ponds that are permitted as part of the mining and post-mining activities on the properties. Each discharge outlet is subject to effluent limits for the various components contained in the discharge according to the NPDES permit(s). Excursions from these effluent limits, and particularly the aluminum component of the discharge, have been the basis for the above-mentioned lawsuit. This Action Plan has been formulated to develop and implement remediation activities to reduce the aluminum component from the various discharge points and to achieve compliance with effluent limits for each outlet as established by the NPDES permits.

The current NPDES permit discharge limits for aluminum are 0.14 mg/L daily maximum and 0.08 mg/L monthly average for the outlets addressed by the Plan. While the discharge limits are based on total aluminum (Al), the total aluminum reported is a combination of both the dissolved and suspended aluminum in the effluent. Evaluation of existing data as well as new sampling to further define the fractions of suspended and dissolved aluminum will be done to help guide work on the tasks contained in this Action Plan. The Action Plan contains tasks that are intended to specifically identify approaches to reduce the dissolved solids in the effluent and also contains activities that employ various reasonable approaches to facilitate reduction of the suspended solids in the effluent.

## ACTION PLAN

The Action Plan has been developed to include steps to identify the basis of the problem, develop solutions to address the problem, and to implement long-term operating procedures and programs to meet Powellton's obligations under the NPDES permits. This Plan consists of three phases which are outlined below:

1.  **Problem Source Identification**

    Activities to Address Issues Regarding Dissolved Aluminum

    Isolating the source of the aluminum of the discharge effluent is the first step in fashioning a program to control it. Water chemistry at the sources and discharges will be analyzed in an attempt to develop reasonable and effective controls of the dissolved aluminum and physical changes that could be made in the operations that could reduce aluminum originating from suspended solids will be reviewed.

    The persistence of soluble aluminum at pH 6.2 or greater is unusual in that, when treating acidic mine drainage water, most aluminum has precipitated as $Al(OH)_3$ by pH

1

4.5 to 5.0. Therefore it seems anomalous that aluminum remains in solution at a pH of 6.2. In addition, the site is subject to intense storms resulting in a highly variable discharge profile. Discharges increase in volume and [Al] during these high flow events to the extent that the discharge limits may be exceeded.

The source of soluble aluminum in mine drainage is ultimately pyrite oxidation, the generation of protons which attack aluminosilicate clays in shale and the subsequent liberation of aluminum ion ($Al^{3+}$). To the extent that there is sufficient alkalinity in the rock, proton acidity will be neutralized and iron will precipitate as a hydroxide in the backfill. Under oxidizing conditions, iron precipitates as $Fe(OH)_3$ at pH 3.5. $Al(OH)_3$ precipitates at pH 4.5. As acidity neutralization occurs, first iron, then aluminum hydroxide formation competes for hydroxide ions $(OH)^-$. If hydroxide ions are in insufficient supply to occupy all of the aluminum sites then soluble complexes form. The addition of alkalinity (hydroxide ions) to aluminum ion follows the following three equations:

1. $Al^{3+} + (OH)^- >>> Al(OH)^{2+}$ soluble
2. $Al(OH)^{2+} + (OH)^- >>> Al(OH)_2^+$ soluble
3. $AL(OH)_2^+ + (OH)^- >>> Al(OH)_3$ solid

Note that the products of equations 1 and 2 are soluble. Only $Al(OH)_3$ is insoluble. Thus, the system requires sufficient hydroxide ion to occupy all of the available aluminum sites in order to completely remove aluminum as a hydroxide. In addition to aluminum hydroxide ($Al(OH)_3$) aluminosilicate clay is potentially another sink for aluminum ions.

The objective of undertaking activities to identify the portion of dissolved aluminum in the effluent is to find an efficient process for maintaining [Al] below the effective discharge limit under varying weather conditions and will include testing of four main hypotheses and potentially two others based on the results of testing the initial four. These are:

1. There is insufficient hydroxide ion present to precipitate all aluminum as $Al(OH)_3$.

   Test: Titrate samples of site water with NaOH to pH 10.0 and observe total/soluble [Al] response. If the hypothesis is correct,[Al] will be below 0.14 mg/L (the current daily maximum effluent limit) by the time the pH is between 7.5 and 8.5. Stoichiometric analysis will determine the appropriate alkalinity application rate.

   This is the most likely factor controlling aluminum solubility on the site. If correct, then pH adjustment would be the preferred treatment strategy. This could take the form of caustic addition, soda ash briquettes or passive treatment options such as steel slag or limestone addition. The titrated acidity value should provide a reasonable approximation of hydroxide ion requirements. This can be easily translated into a caustic application rate schedule for the titration experiment.

2. Imbalance of Al with Si

2

Test: Titrate samples of site water with $Na_2SiO_3$ and observe [Al] response. If this leads to consistent and efficient removal of aluminum and pH adjustment fails, then it might be the subject of additional investigation.

It is unlikely that Al and Si are out of balance since they have a common source (shale). However, they have different precipitation chemistries and localized imbalances may restrict the efficiency of this sink.

3. Equilibrium of aluminosilicate clay with water may simply exceed an [Al] of 0.14 mg/L (the current daily maximum effluent limit) at pH 6.2.

Test: Place distilled and appropriate buffer solutions of a range of pH in contact with shale samples from the site and allow the solution to come to equilibrium with the solid phase over a period of weeks. Maintain constant pH by regular testing/titration. Test for [Al] response.

This will indicate the baseline [Al] that would be expected if the only reaction were between rainwater and shale. The calculated solubility of all aluminum species at ph 6.2 should be less than 0.027 mg/L, so unless there are additional complexing agents (see Hypothesis 4 below) besides hydroxide ion, it is unlikely that equilibrium with aluminosilicate clay would yield [Al] greater than 0.027 mg/L, roughly one tenth of the [Al] seen at Powellton.

4. Complexation of $Al^{3+}$ with either $Cl^-$ or $F^-$

Test: Evaluate water sampling data for Cl and F. If present and if hypotheses 1 and 2 do not work, then decomplexation may be tested by treating site water samples with agents such as KOH or KCl.

Surface mine waters can contain minor concentrations of chloride and fluoride. Both can form stable complexes with aluminum. Concentrations less than 10 mg/L may be sufficient to maintain aluminum in solution despite pH adjustment.

In the event that the testing as outlined above does not produce favorable results, additional testing that has been suggested by Plainiffs may be undertaken. These tests would include:

5. Downward pH adjustment

Test: It would require a pH of about 9.5 to bring enough $Al(OH)_4^-$ into solution to raise the [Al] to 0.27 mg/L. At pH 7.0 the concentration of $Al(OH)_4^-$ would be about 0.00085 mg/L (according to Stumm and Morgan, 1966). This hypothesis will be evaluated through the titration testing in the course of testing hypothesis 1 above.

3

It is understood that at very high pH the complex ion $Al(OH)_4^+$ may form, bringing aluminum back into solution. However, pH levels have not been observed in this range on the property as there are no alkaline agents added to the water and the local geology could not generate pH in that range.

Activities to Address Issues Regarding Suspended Aluminum

Physical aspects of the Powellton operations that could contribute to higher concentrations of aluminum in the discharge will be reviewed as follows:

6. On-site/off-site water management

   Water sources will be identified and best management practice designs will be developed to manage flow onto permitted areas from non-permitted areas (off-site work is unlikely to be a practical alternative due to the steep terrain and extensive pre-law "shoot and shove" operations both above and below the bonded, reclaimed contour areas).

7. Non-aluminum flocculants

   Test: Identification of suitable flocculants and their application rates if hypotheses 1, 2, or 4 above are unsuccessful, then a range of non-aluminum flocculants can be tested.

   Flocculants are compounds that cause dispersed, suspended solids to form larger aggregates (flocs) and thereby accelerate their settlement rate. This testing would likely not have an impact on dissolved aluminum.

8. Existing drainage and sediment control structures will be evaluated for effectiveness and their ability to meet design requirements.

9. An evaluation of the property will be undertaken to determine the existence of exposed shale material at ground surface (areas with thin soil covering the backfill).

10. Existing on-site treatment systems will be evaluated to determine operational effectiveness. Evaluation of these systems will concentrate on the following:

    - The systems will be evaluated to determine whether they were designed and functioning properly
    - The systems will be evaluated to determine whether they are being maintained to allow for the required capacity
    - The systems will be evaluated to determine if areas of excessive erosion exist which could potentially lead to overloading of the structures.

4

11. The potential to improve treatment by design and installation of supplemental physical treatment systems or modification of existing structures will be evaluated. The existing structures will be evaluated to determine if the structures could be enlarged while maintaining compliance with the regulations so that if the selected chemical treatment process determined in the chemical evaluation process would require additional volume and/or contact time. If they need to be enlarged, it will be determined whether it can be done while maintaining the existing project footprint and compliance with the DEP/MSHA/USACE regulations (i.e. maintain SWROA compliance, maintain Dam Control Act compliance, enlargement not requiring additional USACE impacts).

## 2.   Solution Implementation

Potential solutions for reduction of aluminum concentration in the discharge based on the problem source identification outlined above will be ranked according to their likelihood of success. An implementation plan, which may consist of one or a combination of the possible solutions, will be developed along with a sampling plan to gauge results. Interim reports will be developed regarding the success of the plan and a final report will be issued once implementation of the solutions has been accomplished.

Once the most effective chemical treatment process is determined, each existing physical treatment structure will be evaluated to determine the appropriate supplemental treatment structures and feasibility of implementation and/or structure modification. Any system modification will be restricted by the requirement to maintain SWROA compliance, maintain structures to avoid classification under the West Virginia Dam Control Act, and prevent in-channel construction downstream of existing structures.

## 3.   Implementation of Solution Review Program

In conjunction with final implementation of an effectively demonstrated solution to reduce the aluminum content of discharges from the Powellton sites, additional programs would be implemented to enhance the ability of the company to maintain compliance to the various permits. Those programs would be:

♦   Treatment System Audits – Audits of all treatment systems on-site would be performed to determine effective operation and would also be reviewed for implementation of enhancements that could improve performance and reliability.

♦   Annual Third Party Environmental Audits/Effluent Limit Violation Response – Audits would be conducted to evaluate excursions from mandated NPDES requirements, procedures for response to those excursions, actions taken during the excursions, and amendments made to response plans if improvements can be made.

♦   Maintenance of Treatment Systems – As is presently occurring on-site, regular maintenance of physical treatment systems will ensure adequate sediment

5

capacity is maintained. Standard Operating Procedures for each individual treatment system will also be developed.

It is expected that from initiation of this Action Plan, implementation of the chosen solutions can be accomplished in a 26-week period. A time line for implementation and completion of activities undertaken in this action plan is attached. The implementation timeline does not take into consideration the possibility of any permit modifications that may be required based on the outcome of any of the steps of this Action Plan. Should permit modifications be required, implementation of those steps could only be completed upon approval of those permit modifications from the appropriate governmental entity.

6



Action Plan Time Line
Powellton Coal Co.
Porposed settlement of Sierra Club v. Powellton Coal Co.  Civ. No. 2:08-cv-1363

APPENDIX B

**APPENDIX C**

Powellton shall undertake sampling studies to evaluate the contribution of aluminum from groundwater flow from the toe of the fill as well as the contribution of aluminum from surface runoff.  One test shall be run on a day after which no rain has occurred during the past 3 days.  The second test shall encompass the beginning and part of the duration of a moderate to large rainfall event.

Water quality samples shall be collected at 1-hr intervals, beginning at time =0 and ending at the 8–hr point, for a total of 9 samples.  Samples shall be collected at the toe of Valley Fill No. 1 and at the toe of Valley Fill No. 2A of the Bridge Fork Surface Mine.  All samples shall be monitored for TSS, Total Al, dissolved Al, pH, Total Fe, Total Mn.

For the wet weather sampling, rainfall data shall be recorded, either from a very nearby weather station, or collected onsite.

Flows shall also be evaluated during the sampling studies using an appropriate flow measuring device.  Water flows at the sampling points shall be monitored at the 9 times when samples are taken.

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

SIERRA CLUB and
ANSTED HISTORIC PRESERVATION
COUNCIL, INC.,

    Plaintiffs,

v.

Civil Action No. 2:08-1363

POWELLTON COAL COMPANY, LLC,

    Defendant.

### ORDER

In its February 3, 2010 Memorandum Order and Opinion, the Court invited the Parties to clarify the extent of Defendant's post-complaint violations. Based on the Parties' submissions, including their Joint Stipulation (Docket #70) and the Court's February 3, 2010 Memorandum Order and Opinion, it is, accordingly, ORDERED as follows:

1. That Plaintiffs' motion for summary judgment as to Counts 1, 3, and 5 under the Clean Water Act be, and it hereby is, granted as to the 295 violations of daily maximum effluent limitations and 301 violations of average monthly effluent limitations identified in Exhibit 3 to the Joint Stipulation(Docket # 70-3), for which Plaintiff has established ongoing violations under this Court's February 3, 2010 Memorandum Order

**APPENDIX D**

and Opinion based on Defendant's post-complaint

violations of the following parameters:

|    | PERMIT    | OUTFALL | PARAMETER              |
|----|-----------|---------|------------------------|
| 1  | WV1019279 | 001     | Aluminum               |
| 2  | WV1019279 | 002     | Aluminum               |
| 3  | WV1019279 | 002     | Manganese              |
| 4  | WV1019279 | 003     | Aluminum               |
| 5  | WV1019279 | 005     | Aluminum               |
| 6  | WV1019279 | 011     | Aluminum               |
| 7  | WV1019279 | 012     | Aluminum               |
| 8  | WV1019279 | 014     | Aluminum               |
| 9  | WV1019279 | 015     | Aluminum               |
| 10 | WV1019279 | 019     | Aluminum               |
| 11 | WV1019279 | 020     | Aluminum               |
| 12 | WV1019279 | 020     | Total Suspended Solids |
| 13 | WV1019279 | 021     | Aluminum               |
| 14 | WV1019279 | 022     | Aluminum               |
| 15 | WV1019279 | 023     | Aluminum               |
| 16 | WV1019279 | 024     | Aluminum               |
| 17 | WV1019279 | 026     | Aluminum               |
| 18 | WV1019279 | 029     | Aluminum               |
| 19 | WV1019279 | 034     | Aluminum               |
| 20 | WV1019279 | 035     | Aluminum               |
| 21 | WV1019287 | 001     | Aluminum               |
| 22 | WV1019287 | 001     | Total Suspended Solids |
| 23 | WV1019449 | 004     | Aluminum               |
| 24 | WV1019449 | 019     | Aluminum               |
| 25 | WV1019449 | 019     | Total Suspended Solids |
| 26 | WV1019449 | 020     | Aluminum               |
| 27 | WV1019449 | 022     | Aluminum               |
| 28 | WV1019449 | 027     | Aluminum               |
| 29 | WV1019449 | 027     | Iron                   |
| 30 | WV1019449 | 027     | Total Suspended Solids |
| 31 | WV1019449 | 028     | Aluminum               |
| 32 | WV1019449 | 029     | Aluminum               |
| 33 | WV1019449 | 030     | Aluminum               |
| 34 | WV1019449 | 030     | Iron                   |

2.     That plaintiffs' motion for summary judgment as to

Counts 1, 3, and 5 under the Clean Water Act be, and

it hereby is, denied in all other respects.

**APPENDIX D**

3.    That plaintiffs' motion for summary judgment as to

Counts 2, 4, and 6 under the Surface Mining Control

and Reclamation Act be, and it hereby is, granted

insofar as the claims correspond to the violations of
**in paragraph 1**
the parameters identified above and denied in all
                         ^
other respects.

Based on the parties Joint Stipulation, the Court defers

ruling on plaintiffs' claims as to the following parameters

unless and until moved to do so by either of the parties:

|    | PERMIT    | OUTFALL | PARAMETER              |
|----|-----------|---------|------------------------|
| 1  | WV1019279 | 001     | Iron                   |
| 2  | WV1019279 | 018     | Aluminum               |
| 3  | WV1019279 | 020     | Iron                   |
| 4  | WV1019279 | 021     | Iron                   |
| 5  | WV1019279 | 026     | Manganese              |
| 6  | WV1019279 | 029     | Iron                   |
| 7  | WV1019449 | 009     | Aluminum               |
| 8  | WV1019449 | 019     | Iron                   |
| 9  | WV1019449 | 020     | Total Suspended Solids |
| 10 | WV1019449 | 020     | Iron                   |
| 11 | WV1019449 | 022     | Total Suspended Solids |
| 12 | WV1019449 | 022     | Iron                   |
| 13 | WV1019449 | 029     | Total Suspended Solids |
| 14 | WV1019449 | 029     | Iron                   |
| 15 | WV1019449 | 030     | Total Suspended Solids |

The Clerk is directed to forward copies of this Order to

all counsel of record.

DATED: April 26, 2010

John T. Copenhaver, Jr.
United States District Judge

3

**APPENDIX D**

Prepared by:

**/s/ Derek O. Teaney**
Derek O. Teaney (W. Va. Bar No. 10223)
Joseph M. Lovett (W. Va. Bar No. 6926)
Appalachian Center for the Economy & the Environment
P.O. Box 507
Lewisburg, WV 24901
Telephone:  (304) 793-9007
Fax:  (304) 645-9008
dteaney@appalachian-center.org
jlovett@appalachian-center.org
*Counsel for Plaintiffs Sierra Club and Ansted Historic
Preservation Council, Inc.*

Reviewed by:

**/s/ Andrew B. McCallister**
S. Crockett, Jr. (WV State Bar No. 9229)
Allyn G. Turner (WV State Bar No. 5561)
Andrew B. McCallister (WV State Bar No. 10026)
Spilman Thomas & Battle, PLLC
Post Office Box 273
Charleston, West Virginia 25321-0273
Telephone: (304) 340-3800
Facsimile: (304) 340-3801
jcrockett@spilmanlaw.com
aturner@spilmanlaw.com
amccallister@spilmanlaw.com
*Counsel for Defendant Powellton Coal Company, LLC*

**APPENDIX D**

**CERTIFICATE OF SERVICE**

I, Derek O. Teaney, do hereby certify that on this 25th day of
February, 2010, I electronically filed the foregoing using the
CM/ECF system, which will send notification of such filing to
the following CM/ECF participants:

> Andrew B. McCallister
> James S. Crockett, Jr.
> Allyn G. Turner
> Spilman Thomas & Battle, PLLC
> P.O. Box 273
> Charleston, WV 25321-0273
> *amccallister@spilmanlaw.com*
> *jcrockett@spilmanlaw.com*
> *aturner@spilmanlaw.com*


**/s/ Derek O. Teaney**
*Counsel for Plaintiffs*

**APPENDIX D**